*410 Judge RYAN
delivered the opinion of the Court.
A special court-martial consisting of officer and enlisted members convicted Appellant, contrary to her pleas, of one specification of failing to go to her appointed place of duty, one specification of disrespect toward a superior commissioned officer, and four specifications of disobeying the lawful order of a noncommissioned officer (NCO), in violation of Articles 86, 89, and 91, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 886, 889, 891 (2012). The members sentenced Appellant to a reduction to pay grade E-l and a bad-conduct discharge. The convening authority approved the sentence as adjudged. The United States Navy-Marine Corps Court of Criminal Appeals (NMCCA) affirmed the findings and sentence. United States v. Sterling, No. NMCCA 201400150, 2015 WL 832587, at *1, *10 (N-M.Ct.Crim. App. Feb. 26, 2015) (unpublished).
The Religious Freedom Restoration Act (RFRA), 42 U.S.C. 2000bb-l (2012) (as amended), which, by its own terms, applies to every “branch, department agency, instrumentality, and official (or other person acting under color of law) of the United States,” 42 U.S.C. § 2000bb-2(l), also applies in the military context. Indeed, at least two general orders prescribe the manner in which religious accommodations to rules of general applicability should be processed and facilitated in the military. Dep’t of Defense Instr. 1300.17, Accommodation of Religious Practices Within the Military Services (Feb. 10, 2009, Incorporating Change 1, Jan. 22, 2014) [hereinafter DoDI 1300.17]; Dep’t of the Navy, Secretary of the Navy Instr. 1730.8B CH-1, Accommodation of Religious Practices (Mar. 28, 2012) [hereinafter SECNAVINST 1730.8B CH-1]. But we note from the outset that this is not the usual case where an individual or group sought an accommodation for an exercise of religion and it was denied. Nor is it a case where the practice at issue was either patently religious, such as the wearing of a hijab, or one where it was not but a government actor somehow knew the practice was religious and prohibited it on that basis. Rather, the claimed exercise of religion at issue in this ease involved posting the printed words “[n]o weapon formed against me shall prosper” at a shared workspace in the context of Appellant’s contentious relationship with her superiors.
As the NMCCA concluded, Appellant did not inform the person who ordered her to remove the signs that they had had any religious significance to Appellant, the words in context could easily be seen as combative in tone, and the record reflects that their religious connotation was neither revealed nor raised until mid-trial. See Sterling, 2015 CCA LEXIS 65, at *11, *14-15, *19, 2015 WL 832587, at *4, *5, *6. Nor, despite the existence of procedures for seeking a religious accommodation, did Appellant seek one. Sterling, 2015 CCA LEXIS 65, at *15, 2015 WL 832587, at *5. Nonetheless, the following issues are before this Court:
SPECIFIED ISSUES
I. DID APPELLANT ESTABLISH THAT HER CONDUCT IN DISPLAYING SIGNS REFERENCING BIBLICAL PASSAGES IN HER SHARED WORKPLACE CONSTITUTED AN EXERCISE OF RELIGION WITHIN THE MEANING OF THE RELIGIOUS FREEDOM RESTORATION ACT, 42 U.S.C. 2000bb-l (2012), AS AMENDED? IF SO, DID THE ACTIONS OF HER SUPERIOR NONCOMMISSIONED OFFICER IN ORDERING HER TO TAKE THE. SIGNS DOWN, AND IN REMOVING THEM WHEN SHE DID NOT, CONSTITUTE A SUBSTANTIAL BURDEN ON APPELLANT’S EXERCISE OF RELIGION WITHIN THE MEANING OF THE ACT? IF SO, WERE THESE ACTIONS IN FURTHERANCE OF A COMPELLING GOVERNMENT INTEREST AND THE LEAST RESTRICTIVE MEANS OF FURTHERING THAT INTEREST?
II. DID APPELLANT’S SUPERIOR NONCOMMISSIONED OFFICER HAVE A VALID MILITARY PURPOSE IN ORDERING APPELLANT TO REMOVE SIGNS REFERENCING BIBLICAL PASSAGES FROM HER SHARED WORKPLACE?
CERTIFIED ISSUES
*411 I. DID APPELLANT’S FAILURE TO FOLLOW AN INSTRUCTION ON THE ACCOMMODATION OF RELIGIOUS PRACTICES IMPACT HER CLAIM FOR RELIEF UNDER THE RELIGIOUS FREEDOM RESTORATION ACT?
II. DID APPELLANT WAIVE OR FORFEIT HER RELIGIOUS FREEDOM RESTORATION ACT CLAIM OF ERROR BY FAILING TO RAISE IT AT TRIAL?
We hold that the orders to remove the signs were lawful. Appellant’s claimed defense to violating those orders under RFRA was preserved, but Appellant has failed to establish a prima facie RFRA ease. Moreover, we hold that her failure to either inform her command that the posting of the signs was religiously motivated or seek an accommodation are both relevant to Appellant’s failure to establish that the orders to remove the signs constituted a substantial burden on her exercise of religion. Consequently, while the NMCCA’s RFRA analysis was flawed, we affirm the decision on other grounds.
I. FACTS
In December 2012, Appellant was assigned to Section-6 (S—6) of the 8th Communications Battalion. Staff Sergeant (SSgt) Alexander was her immediate supervisor. Appellant assisted Marines with their Common Access Cards. Marines sat next to Appellant’s desk while she assisted them. The military judge found that, during this time, Appellant shared her desk with another junior Marine.
Appellant had ongoing difficulties and a contentious relationship with many superiors in her command, including SSgt Alexander. While Appellant characterized the difficulties as “people ... picking on [her],” from the command’s perspective, the difficulties were that:
[Appellant] fails to provide a positive contribution to the unit or Corps. [Appellant] cannot be relied upon to perform the simplest of tasks without 24/7 supervision. [Appellant] has not shown the discipline, professional growth, bearing, maturity or leadership required to be a Marine. Ultimately [Appellant] takes up [the] majority of the Chain of Command’s time dealing with her issues that result from nothing more than her failure to adapt to military life.
The charges at issue in this case are symptomatic of these deficiencies, and other performance issues, while not the subject of criminal charges, were noted in her service record book. In May 2013, two months after a counseling session for failing to secure a promotion, and on the heels of a confrontation with SSgt Alexander about turning in a completed Marine Corps Institute course, Appellant printed three copies of the words “[n]o weapon formed against me shall prosper,” on 8 ½- x 11-inch paper in 28-point font or smaller. Appellant cut the signs to size and taped one on the side of her computer tower, one above her computer screen, and one above her desk mailbox. The signs contained no additional information and were large enough for those walking by Appellant’s desk and Marines seated at her workspace to read.
SSgt Alexander discovered the signs and ordered Appellant to remove them because “it wasn’t just her desk; it was being shared by the other junior Marine.” According to Appellant, SSgt Alexander said that she wanted the signs removed because she did not like their tone. Nothing in the record indicates that SSgt Alexander knew that the text was Biblical in origin, and the NMCCA found that Appellant never informed SSgt Alexander that the signs had either a religious genesis or any religious significance to Appellant. Sterling, 2016 CCA LEXIS 65, at *11, *14-15, 2015 WL 832587, at *4, *5, *6.
Appellant failed to remove the signs, so SSgt Alexander removed them herself. The next day, SSgt Alexander saw that Appellant had replaced the signs and once more ordered Appellant to remove them. Appellant also failed to follow this order, and SSgt Alexander again removed the signs. In addition to failing to mention the religious nature of or religion practice involved to SSgt Alexander, Appellant also failed to request a religious accommodation to enable her to display *412 the signs. Sterling, 2015 CCA LEXIS 65, at *15, 2015 WL 832587, at *5.
In August 2013, another of Appellant’s superiors, SSgt Morris, noticed that Appellant was not wearing the proper uniform, and he ordered her to wear “her service uniforms as directed by the Commandant of the Marine Corps.” According to SSgt Morris, Appellant refused to obey the order because Appellant said “she had a medical chit out there stating she could not wear the uniform.” SSgt Morris spoke with medical personnel at the base, who stated that Appellant could wear the required uniform, and he again ordered Appellant to change into the proper uniform. Appellant refused. SSgt Morris then escorted Appellant to First Sergeant (IstSgt) Robinson, who repeated the order for a third time. Appellant again refused.
On September 12, 2013, IstSgt Robinson ordered Appellant to report to the Pass and Identification building on Sunday, September 16, 2013, from 4:00 PM until approximately 7:30 PM, to help distribute vehicle passes to families of service members returning from deployment. According to IstSgt Robinson, Appellant refused on the basis that “she was on medication.” On September 13, 2013, IstSgt Robinson informed Major (Maj) Flat-ley that he was having issues with Appellant. Maj Flatley met with Appellant to “talk some sense into her, reason with her, [and] to make sure that she goes to her appointed place of duty on Sunday.” During their conversation, Maj Flatley attempted to hand the vehicle passes to Appellant. According to Maj Flatley, Appellant refused to take the passes and stated that she would not be there and would be sleeping. As a result, Maj Flatley called IstSgt LaRochelle and directed her to begin writing a charge sheet on Appellant.
Maj Flatley gave Appellant another chance to comply and again ordered Appellant to distribute passes on Sunday. Maj Flatley asked whether Appellant understood the order and would comply. According to Maj Flatley, Appellant said that she understood the order but was not going to be there, and instead was “going to take [her] meds and sleep and go to church.” Maj Flatley explained to Appellant that distributing the passes did not conflict with church because the passes did not need to be distributed until 4:00 PM bn Sunday. On September 15, 2013, Appellant did not report to her appointed place of duty.
A special court-martial for charges resulting from the above incidents commenced in January 2014. At trial, the military judge cautioned Appellant about the dangers of appearing pro se, Nonetheless, Appellant elected to represent herself, with limited assistance from defense counsel. As relevant to the issues before this Court, during the middle of trial and days after SSgt Alexander’s initial direct trial testimony about Appellant’s failure to obey her orders to remove the signs, Appellant moved to dismiss those orders violations.
Appellant argued for the first time that the orders to remove the signs were “unlawful under the grounds of [her] religion” and that the Department of Defense (DoD) permitted her to practice her religion “as long as it’s within good order [and] discipline.” Appellant indicated that she was a nondenominational Christian and that the quotations were “a [B]ible scripture” and “of a religious nature.” Without argument or comment, Appellant also submitted DoDI 1300.17 (Jan. 22, 2014), which referenced RFRA and incorporated RFRA’s language.[1] Appellant testified that because she was a religious person, she posted the signs in the form of the Christian Trinity to have the “protection of three” and to serve as a “mental note.”
Appellant also testified that the signs were “just purely personal” and served as “a mental reminder to [her] „ when [she came] to work .,[because she did not] know why these people [were] picking on [her].” Appellant stated that she believed her situation with her command was unfair because she was being picked on, including by SSgt Alexander. The Government reasserted that the *413 signs were ordered to be taken down because they were distracting.
The military judge held that SSgt Alexander’s orders were lawful because they were “related to a specific military duty,” SSgt Alexander was authorized to give them, and each order required Appellant to do something immediately or at a future time. Furthermore, the military judge held that the orders were reasonably necessary to safeguard military interests and good order and discipline because other servicemembers could have seen the signs in the shared workspace and the signs’ language, “although ,.. [Bjiblical in nature ... could easily be seen as contrary to good order and discipline.” Finally, the military judge ruled that the orders to remove the signs “did not interfere with [Appellant’s] private rights or personal affairs.”
II. NMCCA DECISION
On appeal, the NMCCA, held, inter alia, that SSgt Alexander’s orders served a valid military purpose and were lawful. Sterling, 2015 CCA LEXIS 66, at *19, 2015 WL 832587, at *6. The NMCCA held that the orders maintained good order and discipline because (1) the signs could have fostered religious divisions in the military workplace [2] and (2) the signs expressed Appellant’s antagonism toward her command. While the court noted that the military judge’s factual findings were meager and “fail[ed] to illuminate why the military judge believed the signsf’] verbiage ‘could easily be seen as contrary to good order and discipline,’ ” the NMCCA nonetheless observed that the record adequately supported the military judge’s conclusion that SSgt Alexander’s orders were lawful. Sterling, 2015 CCA LEXIS 65, at *16-17, 2015 WL 832587, at *5.
Recognizing Appellant’s bellicose relationship with her command, the NMCCA found that Appellant was “locked in an antagonistic relationship with her superiors,” that the signs could be interpreted as combative, and agreed with the military judge that the signs could thus “easily be seen as contrary to good order and discipline.” Sterling, 2015 CCA LEXIS 65, at *19, 2015 WL 832587, at *6 (internal quotation marks omitted).
The NMCCA then concluded that Appellant was not entitled to a defense to the orders violations based on RFRA. Sterling, 2015 CCA LEXIS 65, at *15, 2015 WL 832587, at *5. The NMCCA held that the definition of religious exercise required “the practice be ‘part of a system of religious belief.’” Sterling, 2015 CCA LEXIS 65, at *14, 2015 WL 832587, at *5. Reasoning from this premise, it went on to conclude that Appellant’s posting of signs containing a Biblical quotation in three places around her workstation did not- qualify as a religious exercise and that as a result, RFRA did not apply. Sterling, 2015 CCA LEXIS 65, at *15, 2015 WL 832587, at *5. The court observed, “[w]hile [Appellant’s] explanation at trial may invoke religion, there is no evidence that posting signs at her workstation was an ‘exercise’ of that religion in the sense that such action was ‘part of a system of religious belief.’ ” Sterling, 2015 CCA LEXIS 65, at *15-16, 2015 WL 832587, at *5. Moreover, the court noted that Appellant never stated that the signs had a “religious connotation” and never requested any religious accommodation for them. Sterling, 2015 CCA LEXIS 65, at *15, 2015 WL 832587, at *5. Rather, the court found that the record demonstrated that Appellant had placed the signs as “personal reminders that those she considered adversaries could not harm her.” Sterling, 2015 CCA LEXIS 65, at *15, 2015 WL 832587, at *5.
III. DISCUSSION
• A. The Orders to Remove the Signs Were Lawful
“The legality of an order is a question of law that [this Court] review[s] de *414 novo.” United States v. Moore, 58 M.J. 466, 467 (C.A.A.F.2003). This Court defers to a military judge’s factual findings “unless they are clearly erroneous or unsupported by the record.” United States v. Rader, 65 M.J. 30, 33 (C.A.A.F.2007). The same deference applies to the NMCCA’s factual findings. United States v. Tollinchi, 54 M.J. 80, 82 (C.A.A.F.2000).
A lawful order “must relate to military duty, which includes all activities reasonably necessary to accomplish a military mission, or safeguard or promote the morale, discipline, and usefulness of members of a command and directly connected with the maintenance of good order in the service.” Manual for Courts-Martial, United States pt. IV, para. 14.c.(2)(a)(iv) (MCM). “[T]he dictates of a person’s conscience, religion, or personal philosophy cannot justify or excuse the disobedience of an otherwise lawful order.” MCM pt. IV, para. 14.c.(2)(a)(iv). “An order is presumed to be lawful, and the accused bears the burden of rebutting the presumption.” United States v. Ranney, 67 M.J. 297, 301-02 (C.A.A.F.2009) (citation omitted) (internal quotation marks omitted), overruled by United States v. Phillips, 74 M.J. 20, 22-23 (C.A.A.F.2015). “To be lawful, an order must (1) have a valid military purpose, and (2) be clear, specific, and narrowly drawn.” Moore, 58 M.J. at 468 (citation omitted). “The order must not conflict with the statutory or constitutional rights of the person receiving the order.” MCM pt. IV, para. 14.e.(2)(a)(v).
Appellant argues that there was no valid military purpose in ordering her to remove the signs from her shared work space. We disagree. The military judge’s and NMCCA’s findings that Marines sharing or coming to the workspace would be exposed to the signs, are not clearly erroneous. Sterling, 2015 CCA LEXIS 65, at *17, 2015 WL 832587, at *6. SSgt Alexander was Appellant’s immediate supervisor and testified that she wanted the signs removed because she wished to keep the shared workspace clean.
Importantly, the NMCCA’s findings that Appellant had a “contentious” relationship with her command, “even prior” to this incident, and that, in that context, posting the words “[n]o weapon formed against me shall prosper” might be “interpreted as combative” are also not clearly erroneous. 2015 CCA LEXIS 65, at *19, 2015 WL 832587, at *6 (internal quotation marks omitted). Appellant herself conceded that SSgt Alexander did not like the signs’ tone, and the NMCCA found that Appellant did not tell SSgt Alexander that the signs had a religious connotation. Sterling, 2015 CCA LEXIS 65, at *15, 2015 WL 832587, at *5. Given these circumstances and the complete absence of evidence that SSgt Alexander either knew the signs were Biblical or ordered them removed for that reason, Appellant has failed to rebut the presumption that the orders were lawful and necessary to further the mission of Appellant’s unit by maintaining good' order and discipline. Without question, a junior Marine with a contentious relationship with her superiors posting combative signs in a workspace could undermine good order and discipline.
Appellant fails to rebut the presumption of the lawfulness of the orders, and because she fails to establish a prima facie RFRA case, she also lacks a defense for failing to follow the orders.
B. RFRA[3]
RFRA provides that the “Government shall not substantially burden a person’s exercise of religion even if the burden results from a rule of general applicability,” 42 U.S.C. § 2000bb-l(a). As amended by the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), “ ‘exercise of religion’ ” is broadly defined as “any exercise of religion, whether or not compelled by, or central to, a system of religious belief.” 42 U.S.C. § 2000bb-2 (4) (cross-referencing “ex *415 ercise of religion” as defined in RLUIPA, 42 U.S.C. § 2000cc-5(7)(A)). As we noted above, RFRA applies to the military. See supra p. 3.
“Our review of the requirements of [RFRA], although largely factual in nature, presents mixed questions of fact and law.” United States v. Meyers, 95 F.3d 1475, 1482 (10th Cir.1996). This Court reviews legal questions, including the application of RFRA, de novo. See United States v. McElhaney, 54 M.J. 120, 125 (C.A.A.F.2000). Factual findings are reviewed for clear error. United States v. Gallagher, 66 M.J. 250, 253 (C.A.A.F.2008).
Appellant argues that the NMCCA erred in its rationale for declining to afford her a RFRA defense to the orders violations and that the order to remove the signs substantially burdened her sincerely held religious beliefs. In sum, we agree that the NMCCA erred in defining “religious exercise” for purposes of RFRA. But while the posting of signs was claimed to be religiously motivated at least in part and thus falls within RFRA’s expansive definition of “religious exercise,” Appellant has nonetheless failed to identify the sincerely held religious belief that made placing the signs important to her exercise of religion or how the removal of the signs substantially burdened her exercise of religion in some other way. We decline Appellant’s invitation to conclude that any interference at all with a religiously motivated action constitutes a substantial burden, particularly where the claimant did not bother to either inform the government that the action was religious or seek an available accommodation.
1. Religious Exercise Under RFRA
A RFRA inquiry is triggered by a “religious exercise.” The NMCCA’s holding that RFRA’s definition of “‘religious exercise’ requires the practice be ‘part of a system of religious belief ” was too narrow.[4] Sterling, 2015 CCA LEXIS 65, at *14, 2015 WL 832587, at *5 (quoting 42 U.S.C. § 2000cc-5(7)(A)). RFRA defines “ ‘religious exercise’ ” as “any exercise of religion, whether or not compelled by, or central to, a system of religious belief.” 42 U.S.C. § 2000bb-2(4) (emphasis added) (cross-referencing 42 U.S.C. § 2000ce-5(7)(A)). A “ ‘religious exercise’ ” under RFRA “involves ‘not only belief and profession but the performance of (or abstention from) physical acts’ that are ‘engaged in for religious reasons.’” Burwell v. Hobby Lobby Stores, Inc., — U.S. -, 134 S.Ct. 2751, 2770, 189 L.Ed.2d 675 (2014) (quoting Emp’t Div., Dep’t of Human Res. of Or. v. Smith, 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)).
On the one hand, there was no indication. on the signs that the quote was Biblical, and there was no testimony that Appellant informed SSgt Alexander or anyone else that she posted the signs for religious purposes until trial. On the other hand, Appellant stated she was a “[n]ondenominational” Christian and that the signs “are a [B]ible scripture” of “a religious nature.” Appellant also testified that the signs invoked the Trinity and fortified her against those who were picking on her. Appellant stated that she was motivated to post the signs in order to gain the “protection” of the “[TJrinity,” because she is “a religious person.” Given RFRA’s broad definition of religious exercise, Appellant’s posting of signs could qualify.
However, this does not answer the altogether different questions whether (1) the conduct was based on a sincerely held religious belief, as opposed to being a post-hoc justification for posting signs that were combative in nature and violating orders to remove them, or (2) the orders to remove the signs substantially burdened Appellant’s religious beliefs.
2. Prima Facie RFRA Case
To establish a prima facie RFRA defense, an accused must show by a preponderance of the evidence that the government action (1) substantially burdens (2) a religious belief (3) that the defendant sincerely holds. See, e.g., Holt v. Hobbs, - U.S. -, *416 135 S.Ct. 853, 862, 190 L.Ed.2d 747 (2015); United States v. Zimmerman, 514 F.3d 851, 853 (9th Cir.2007); Kikumura v. Hurley, 242 F.3d 950, 960 (10th Cir.2001). If a claimant establishes a prima facie case, the burden shifts to the government to show that its actions were “the least restrictive means of furthering a compelling governmental interest.” United States v. Quaintance, 608 F.3d 717, 719-20 (10th Cir.2010). Because Appellant fails to establish a prima facie case, the burden does not shift to the Government in this case.
a. Sincerely Held Religious Belief
While religious conduct triggers a RFRA inquiry, RFRA only protects actions that are “sincerely based on a religious belief.” See Holt, 135 S.Ct. at 862. Determining sincerity is a factual inquiry within the trial court’s authority and competence, Korte v. Sebelius, 735 F.3d 654, 683 (7th Cir.2013), and “the [claimant’s] ‘sincerity[5] in espousing that practice is largely a matter of individual credibility,” Tagore v. United States, 735 F.3d 324, 328 (5th Cir.2013). Courts are highly deferential to claimants in evaluating sincerity, Moussazadeh v. Texas Dep’t of Criminal Justice, 703 F.3d 781, 792 (5th Cir.2012), but may still conduct meaningful reviews of sincerity. See Hobby Lobby Stores, 134 S.Ct. at 2774 n.28; Quaintance, 608 F.3d at 721-23; United States v. Manneh, 645 F.Supp.2d 98, 112-13 (E.D.N.Y.2008) (noting that courts are “seasoned appraisers of the ‘motivations’ of parties” and can observe the claimant’s “demeanor during direct and cross-examination”) (citation omitted) (internal quotation marks omitted); Zimmerman, 514 F.3d at 854 (“The district court should hear directly from [the claimant], as his credibility and demeanor will bear heavily on whether his beliefs are sincerely held.”). “Neither the government nor the court has to accept the defendants’ 'mere say-so.” United States v. Bauer, 84 F.3d 1549, 1559 (9th Cir.1996); see also Int’l Soc’y for Krishna Consciousness, Inc. v. Barber, 650 F.2d 430, 441 (2d Cir.1981) (“[A]n adherent’s belief would not be ‘sincere’ if he acts in a manner inconsistent with that belief ... or if there is evidence that the adherent materially gains by fraudulently hiding secular interests behind a veil of a religious doctrine.”) (internal citations omitted); cf. United States v. Messinger, 413 F.2d 927, 928-30 (2d Cir.1969) (referencing a Justice Department recommendation that a defendant-draftee’s “long delay in asserting his conscientious objector claim” was evidence of religious insincerity where his claim eame two years after his Selective Service registration). To be certain, in evaluating sincerity a court may not question “whether the petitioner ... correctly perceived the commands of [his or her] faith.” Thomas v. Review Bd., 450 U.S. 707, 716, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). Nor does a court “differentiate among bona fide, faiths.” See Cutter v. Wilkinson, 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005).
In this case, the record does not clearly address whether Appellant’s conduct was based on a “sincerely held religious belief’ or motivated by animosity toward her chain of command. While Appellant testified that the signs were religious, arranged to mimic the Trinity, and were “personal.,.. mental reminder[s],” she also only raised religion as an explanation for the signs in the middle of trial, and some of her testimony arguably indicates that the signs were actually a response to contentious relationships at work, including with SSgt Alexander. Moreover, the NMCCA’s factual analysis, which is not clearly erroneous, emphasizes this nonreligious basis for the signs. Cf. supra pp. 9, 12 note 4.
Yet, whether her conduct was based on a sincerely held religious belief is an intensely fact-based inquiry, see Korte, 735 F.3d at 683, and is beyond the purview of this Court. United States v. Crider, 22 C.M.A. 108, 110-11, 46 C.M.R. 108, 110-11 (1973). We could simply hold that it was her burden to affirmatively establish the sincerity of her belief by a preponderance of the evidence at trial and that she failed to do so. See Quaintance, 608 F.3d at 719-23. However, because we can resolve the case on the basis of Appellant’s failure to establish that the orders to remove the signs were a substantial burden, we will instead assume arguendo that her conduct was based on a sincerely held religious belief.
*417 b. Substantial Burden
Early drafts of RFRA prohibited the government from placing a “burden” on religious exercise, but Congress added the word “substantially” before passage to clarify that only some burdens would violate the act. 139 Cong. Rec. S14352 (daily ed. Oct. 26, 1993) (statements of Sen. Kennedy and Sen. Hatch). RFRA does not define “substantially burden,” and the federal appellate courts provide several different formulations. Contrary to Appellant’s argument, not every interference with conduct motivated by a sincere religious belief constitutes the substantial burden that RFRA prohibits.
To be sure, all courts agree that a substantial burden exists where a government action places “ ‘substantial pressure on an adherent to modify [her] behavior and to violate [her] beliefs.’” Kaemmerling v. Lappin, 553 F.3d 669, 678 (D.C.Cir.2008) (quoting Thomas, 450 U.S. at 718, 101 S.Ct. 1425); cf. Sherbert v. Verner, 374 U.S. 398, 403-04, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).[5] But no court interpreting RFRA has deemed that any interference with or limitation upon a religious conduct is a substantial interference with the exercise of religion. Instead, and contrary to the dissent’s understanding, courts have focused on the subjective importance of the conduct to the person’s religion, as well as on “whether the regulation at issue ‘force[d claimants] to engage in conduct that their religion forbids or ... prevents them from engaging in conduct their religion requires.’” Mahoney v. Doe, 642 F.3d 1112, 1121 (D.C.Cir.2011) (quoting Henderson v. Kennedy, 253 F.3d 12, 16 (D.C.Cir.2001)). In other words, having restraints placed on behavior that is religiously motivated does not necessarily equate to either a pressure to violate one’s religious beliefs or. a substantial burden on one’s exercise of religion. We agree with the D.C. Circuit that:.
One can conceive of many activities that are not central or even important to a religion, but nevertheless might be religiously motivated... .To make religious motivation the critical focus is, in our view, to read out of RFRA the condition that only substantial burdens on the exercise of religion trigger the compelling interest requirement.
Henderson, 253 F.3d at 17.
Of course, to determine whether a prima facie case has been established, courts do not question “whether the petitioner ..correctly perceived the commands of [his or her] faith.” Thomas, 450 U.S. at 716, 101 S.Ct. 1425. But while we will not assess the importance of a religious practice to a practitioner’s exercise of religion or impose any type of centrality test, a claimant must at least demonstrate “an honest belief that the practice is important tó [her] free exercise of religion” in order to show that a government action substantially burdens her réligious exercise. Sossamon, 560 F.3d at 332; see also Ford, 352 at 593-94. A substantial burden is not measured only by the secular costs that government action imposes; the claimant must also establish that.she believes there are religious costs as well, and this should be clear from the record. See Ira C. Lupu, Hobby Lobby and the Dubious Enterprise of Religious Exemptions, 38 Harv. J.L. & Gen *418 der 35, 80 (2015); cf. Abdulhaseeb v. Calbone, 600 F.3d 1301, 1315 (10th Cir.2010).
This requirement is not novel; language in central Supreme Court opinions on the question of substantial burden affirms that the adherent’s subjective belief in the importance of a practice to her religion is relevant to the substantial burden inquiry. See, e.g., Holt, 135 S.Ct. at 862 (“Here, the religious exercise at issue is the growing of a beard, which petitioner believes is a dictate of his religious faith, and the Department does not dispute the sincerity of petitioner’s belief_ Because the grooming policy puts petitioner to this choice, it substantially burdens his religious exercise.”) (internal citation omitted); Hobby Lobby, 134 S.Ct. at 2764-65, 2778 (noting that the claimants have a sincere religious belief that life begins at conception and “that providing the coverage demanded by the HHS regulations is connected to the destruction of an embryo in a way” that goes “‘against [their] moral conviction to be involved in the termination of human life’”) (internal citations omitted); Wisconsin v.Yoder, 406 U.S. 205, 218, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (holding that secondary schooling substantially interferes with the Amish religion because it “contravenes the basic religious tenets and practices of the Amish faith, both as to the parent and the child”).
In contrast, courts have found that a government practice that offends religious sensibilities but does not force the claimant to act contrary to her beliefs does not constitute a substantial burden. See Navajo Nation v. U.S. Forest Serv., 535 F.3d 1058, 1070 (9th Cir.2008). “A burden is not substantial if ‘it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is riot otherwise generally allowed.’” Sossamon, 560 F.3d at 332. Moreover, “[a]n inconsequential or de minimis burden on religious practice does not [constitute a substantial burden], nor does a burden on activity unimportant to the adherent’s religious scheme.” Kaemmerling, 553 F.3d at 678; see also Midrash Sephardi, Inc., 366 F.3d at 1227; Abdulhaseeb, 600 F.3d at 1321 (recognizing that not every “presentation of a meal an inmate considers impermissible constitutes a substantial burden on an inmate’s religious exercise”); Ford, 352 F.3d at 593-94 (focusing on appellant’s subjective belief that the exercise at issue was “critical to his observance as a practicing Muslim” in evaluating substantial burden).
Appellant has failed to establish that the orders to remove the signs substantially burdened her religious beliefs. While Appellant seeks to cast the substantial burden as caused by the choice between obeying the orders to remove the signs and potentially facing a court-martial, this logic is flawed, as it presumes that taking down the signs constitutes a substantial burden—a burden imposing both secular and religious costs. This is the very legal question to be decided. We reject the argument that every interference with a religiously motivated act constitutes a substantial burden on the exercise of religion. See Kaemmerling, 553 F.3d at 679 (finding “as true the factual allegations that [the claimant’s] beliefs are sincere and of a religious nature—but not the legal conclusion, cast as a factual allegation, that [their] religious exercise is substantially burdened”).
In this case, Appellant did not present any testimony that the signs were important to her exercise of religion, or that removing the signs would either prevent her “ ‘from engaging in conduct [her] religion requires,’ ” Mahoney, 642 F.3d at 1121 (citation omitted), or cause her to “abandonf ] one of the precepts of her religion,” Sherbert, 374 U.S. at 404, 83 S.Ct. 1790. While Appellant testified that posting the signs was religiously motivated in part, she did not testify that she believed it is any tenet or practice of her faith to display signs at work. See Wilson v. James, 139 F.Supp.3d 410, 424-25 (D.D.C.2015). Nor does Appellant’s testimony indicate how complying with the order to remove the signs pressured her to either change or abandon her beliefs or forced her to act contrary to her religious beliefs. See Kaemmerling, 553 F.3d at 678-79; cf. Hankins, 441 F.3d at 104 (detailing the consequences of failing to assert or establish at trial that an action substantially burdens a religious exercise). Al *419 though Appellant did not have to provide evidence that posting signs in her shared workspace was central to her belief system, she did have to provide evidence indicating an honest belief that “the practice [was] important to [her] free exercise of religion.” See Sossamon, 560 F.3d at 332. Contrary to Appellant’s assertions before this Court, the trial evidence does not even begin to establish how the orders to take down the signs interfered with any precept of her religion let alone forced her to choose between a practice or principle important to her faith and disciplinary action.
“[C]ourts must take adequate account of the burdens a requested accommodation may impose on nonbenefieiaries.” See Cutter, 544 U.S. at 720, 125 S.Ct. 2113. In evaluating whether taking down the signs constituted a substantial burden on her exercise of religion, we will not ignore two additional salient facts. First, Appellant never told the person who ordered her to take down the signs—which were not, like the wearing of a hijab, obviously religious to most, see E.E.O.C. v. Abercrombie & Fitch Stores, Inc., - U.S. -, 135 S.Ct. 2028, 2033 n.3, 192 L.Ed.2d 35 (2015)—that they even had a religious connotation, let alone that they were important to her religion. Requiring that minimal step before concluding that an order imposes a substantial burden is certainly not onerous or unreasonable in the military context where orders are presumed to be lawful, adherence to orders is integral to the military performing its mission, and the military force is made up of diverse individuals with diverse backgrounds—with no guarantee those charged with command have any special expertise in religion. Permitting, as the dissent proposes, military members to disobey orders now and explain why later (much later, as in mid-trial in the instant case) makes no sense. It is certain that “the military is, by necessity, a specialized society,” Parker v. Levy, 417 U.S. 733, 743, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), and “to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps,” Goldman v. Weinberger, 475 U.S. 503, 507, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986), As we recently concluded:
“ ‘[T]he military must insist upon a respect for duty and a discipline without counterpart in civilian life. The laws and traditions governing that discipline have a long history [and] are founded on unique military exigencies as powerful now as in the past.’” United States v. Heyward, 22 M.J. 35, 37 (C.M.A.1968) (quoting Schlesinger v. Councilman, 420 U.S. 738, 757 [95 S.Ct. 1300, 43 L.Ed.2d 591] (1975)). Unlike his civilian counterparts, ‘“it is [the service-member’s] primary business ... to fight or be ready to fight wars should the occasion arise.’” [Levy, 417 U.S. at 744 [94 S.Ct. 2547] (citation omitted) ]. In order to achieve this objective, “[n]o question can be left open as to the right to command [by a superior], or the duty [to obey by a subordinate].” In re Grimley, 137 U.S. 147, 153 [11 S.Ct. 54, 34 L.Ed. 636] (1890); accord [Goldman, 475 U.S. at 507] [106 S.Ct. 1310] (1986) (noting that “the military must foster instinctive obedience”).
United States v. Caldwell, 75 M.J. 276, 281-82 (C.A.A.F.2016) (alterations in original).
Second, and relatedly, we will not overlook the reality that DoD and Naval regulations permitted Appellant to request an accommodation for any rule or regulation that she believed substantially burdened her religion, but required that she adhere to and follow orders while awaiting a determination on the matter. See DoDI 1300,17 para. 4(g); SEC-NAVINST 1730.8B CH-1 para. 5(a). Appellant is charged with knowledge of both general orders, and not only did she fail to inform her superiors about the religious significance of the signs from her perspective, she did not request an accommodation.
We recognize that RFRA does not itself contain an exhaustion requirement and that at least one federal appellate court has held that an individual need not request an exemption to invoke RFRA, even if a system for doing so is in place. See Oklevueha Native Am. Church of Haw., Inc. v. Holder, 676 F.3d 829, 838 (9th Cir.2012). But we agree with those courts that have held that an option to request an accommodation “may *420 eliminate burdens on religious exercise or reduce those burdens to de minimis acts of administrative compliance that are not substantial-for RFRA purposes.” Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burnell, 794 F.3d 1151, 1178 (10th Cir.2015), vacated and remanded sub nom. Zubik v. Burwell, - U.S. -, 136 S.Ct. 1557, 194 L.Ed.2d 696 (2016) (per curiam); Priests for Life v. U.S. Dep’t of Health and Human Serv., 772 F.3d 229, 249-52 (D.C.Cir.2014), vacated and remanded sub nom. Zubik, - U.S. -, 136 S.Ct. 1557, 194 L.Ed.2d 696.
Appellant could have requested an exemption from her chain of command to post the signs, and she could have appealed a denial of the request to the Commandant of the Marine Corps. See SECNAVINST 1730.8B CH-1 paras. 5.c, 5.d. The relevant instruction requires commanders to balance requests against considerations such as military readiness and unit cohesion, and commanders must reply to requests within one week. Id. at paras. 5, 5.c. If military necessity precludes honoring a request, commanders are required to “seek reasonable alternatives.” Id. at para. U.d.
While Appellant’s failure to seek an exemption does not prevent her from invoking RFRA, the accommodation process is important for two reasons. First, the established and expeditious option to request an accommodation illustrates the importance that the military places both on respecting the religious beliefs of its members and avoiding substantial burdens on religion where possible. Second, by potentially delaying an accommodation for only a short period of time, the accommodation process interposes a de minimis ministerial act, reducing any substantial burden otherwise threatened by an order or regulation of general applicability, while permitting the military mission to continue in the interim. This consideration is crucial in the military context, as the very lifeblood of the military is the chain of command. United States v. Priest, 21 C.M.A. 564, 570, 45 C.M.R. 338, 344 (1972) (“The armed forces depend on a command structure that at times must commit men [and women] to combat, not only hazarding their lives but ultimately involving the security of the Nation itself.”); see also Caldwell, 75 M.J. at 282.
Because Appellant has not established a prima facie case, this Court need not evaluate whether the orders at issue in this case were the least restrictive means of furthering a compelling government interest.
IV. JUDGMENT
The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

. Prior to and during trial, the Department of Defense updated DoDI 1300.17 (Jan. 22, 2014), providing greater reference to RFRA. Appellant submitted the new instruction. See also DoDI 1300.17 (Feb. 10, 2009) (in place at the time of conduct at issue).

. We reject this basis for concluding that the orders were lawful. While the military judge found that the signs were “[Bjiblical in nature,” that Appellant's desk was shared with another Marine, and that the signs were visible to Marines sitting at Appellant's desk, there is nothing in the record to establish that the signs were readily identifiable as religious quotations, and thus, the notion that they would foster religious divisions seems untenable. Sterling, 2015 CCA LEXIS 65, at *17, 2015 WL 832587, at *6.

. Given Appellant's assertion at trial that the orders violated her religion, the submission of an order that cited RFRA, and the raising of the issue before the NMCCA, we reject the Government's argument that Appellant waived or forfeited her right to assert her RFRA claim on appeal to this Court. Hankins v. Lyght, 441 F.3d 96, 104 (2d Cir.2006).

. It is entirely possible, given the remainder of its conclusions, that the NMCCA intended to hold that posting the signs was not based on a sincerely held religious belief. But that is not what it said.

. However, aside from this point of agreement, there is not precise conformity within-the federal circuits on the exact parameters of what constitutes a “substantial burden.” See, e.g., Sossamon v. Lone Star State of Texas, 560 F.3d 316, 332 (5th Cir.2009) ("A burden is substantial if 'it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs.' ”) (citation omitted) (second emphasis added); Washington v. Klem, 497 F.3d 272, 280 (3d Cir.2007) (“For the purposes of RLUIPA, a substantial burden exists where ... the government'puts substantial'pressure on an adherent to substantially modify his behavior and to violate his beliefs.”) (emphasis added); Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir.2004) (“The combined import of these articulations leads us to the conclu.sion that a 'substantial burden' must place more than an inconvenience on religious exercise; a 'substantial burden' is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly. "Hem-phasis added); Ford v. McGinnis, 352 F.3d 582, 593-94 (2d Cir.2003) (framing inquiry as whether the belief interfered with by the government was "considered central or important to [petitioner’s] practice of Islam.”). The order to remove signs in the instant case does not constitute a substantial burden under any of these formulations.