# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
SMAWLEY, PENLAND, and MORRIS
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Staff Sergeant LESLY J. LINDOR**
**United States Army, Appellant**

ARMY 20210520

Headquarters, III Corps and Fort Hood
Maureen A. Kohn, Military Judge
Colonel Runo C. Richardson, Staff Judge Advocate

For Appellant: Captain Sean Patrick Flynn, JA (argued); Colonel Michael C. Friess, JA; Jonathan F. Potter, Esquire; Major Joyce C. Liu, JA; Captain Sean Patrick Flynn, JA (on brief); Colonel Michael C. Friess, JA; Jonathan F. Potter, Esquire; Major Joyce C. Liu, JA; Captain Sean Patrick Flynn, JA (on reply brief).

For Appellee: Captain Andrew M. Hopkins, JA (argued); Colonel Christopher B. Burgess, JA; Major Pamela L. Jones, JA; Captain Andrew M. Hopkins, JA (on brief).

14 June 2023

--------------------------------
OPINION OF THE COURT
--------------------------------

PENLAND, Senior Judge:

Appellant claims the government violated his constitutional and statutory rights to freely exercise his religion, and he asks us to set aside the adjudged sentence.[1] Finding no violation for most of these claims in the first instance—and waiver of all of them—we deny relief and affirm.[2]

---

[1] Appellant assigned the following errors:

> I.   Whether the government violated the Religious Freedom Restoration Act by using appellant's religion against him;

(continued . . .)

**BACKGROUND**

Consistent with appellant's pleas, a military judge sitting as a general court–martial convicted him of three specifications of attempted premeditated murder, one specification of conspiracy to commit premeditated murder, one specification of willful disobedience of a warrant officer, one specification of murder, and one specification of stalking in violation of Articles 80, 81, 91, 118, and 120a, Uniform Code of Military Justice, 10 U.S.C. §§ 880, 881, 891, 918, 920a [UCMJ]. The military judge sentenced appellant to confinement for life with the possibility of parole and a dishonorable discharge. Pursuant to a pretrial agreement,[3] the convening authority approved only so much of the sentence as provided for confinement for 70 years and a dishonorable discharge.

Appellant was married to ■ but after she told him she was unable to have children, their marriage faltered. Appellant wanted to divorce ■ but she declined for reasons of religious faith. Appellant turned to a Vodou practitioner in Haiti named Bertin Charles and asked for his help to murder ■ instead. Over the course of several months, appellant conspired with Charles to murder ■ with premeditation, and he attempted to kill her multiple times. Appellant traveled to Haiti in June 2018 to obtain a toxin from Charles, and he used it to try to poison ■ after returning to the United States; however, she survived. Appellant also asked

---

(. . . continued)

    II.     Whether the government violated the Free Exercise Clause by using appellant's religion against him;

    III.    Whether the government violated the Free Exercise Clause by being hostile to appellant's religion;

    IV.    Whether the government violated the Equal Protection Clause by using appellant's religion against him;

    V.     Whether the government introduced evidence in violation of R.C.M. 1001 and made improper argument;

    VI.    Whether appellant is entitled to relief for unreasonable post-trial delay.

[2] We have also given full and fair consideration to the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find them to be without merit.

[3] The case was governed by the statutory framework preceding the Military Justice Act of 2016.

Charles to send him a toxic oil to kill his wife—Charles had demonstrated its efficacy in a videotaped, lethal experiment on a cat—but the toxin did not clear U.S. Customs and Border Protection.

In August 2018, appellant again traveled to Haiti, this time with ███ Appellant and Bertin Charles met, and Charles gave appellant one or more poisons to use against ███ At a subsequent meeting, Charles gave appellant yet another toxin. Acting on instructions from Charles, appellant later placed poisonous oil in ███s drinking water, intending to kill her. ███ spit out the distasteful and bad-smelling water, surviving the attempt on her life. Appellant complained to Charles that the toxin did not kill ███ and Charles replied he must have used too small a portion.

Bertin Charles then recommended appellant use another poison, this time a powder. Still in Haiti (and wanting to kill ███ there), appellant placed the poison in ███s food, and she fell ill with vomiting and diarrhea. ███ survived again, however, and returned to the United States with appellant, requiring wheelchair service at the airport because of her illness.

Shortly after returning stateside, ███ went to a nearby hospital, where she was diagnosed and discharged with acute gastroenteritis. Once home though, ███ experienced increasingly debilitating effects from the poison appellant had given her. She began to seize, drool uncontrollably, and her eyes twitched. She returned emergently to the same hospital, from which she was transferred to obtain a higher level of care. By the next day, ███ had significantly improved. Another day passed, and ███ continued to recover in the hospital. On the afternoon of 31 August 2018, appellant poisoned ███'s drinking water, which she drank. Shortly after, she again became very sick. Multiple times, appellant told medical personnel he did not know why, though he later told the military judge at his guilty plea hearing that the poison caused ███'s sickness.[4]

███ recovered again, was discharged from the hospital on 2 September 2018, and returned home. Still determined to kill her, appellant poisoned ███ again, and after another round of agonizing illness, she succumbed early the next morning. A revised autopsy report described the cause of death as "toxic effects of methomyl," a restricted pesticide that causes effects that "overlap with toxic effects of chemical agents such as VX or sarin since they also are classified as acetylcholinesterase inhibitors." (Stipulation of Fact, p. 78–79).

---

[4] The above four paragraphs were derived from Prosecution Exhibit One, the Stipulation of Fact ("stipulation").

Categorized as "Evidence in Aggravation," paragraph 123 of the stipulation states, in pertinent part:

> [Appellant] used [multiple law enforcement information systems] to acquire information about his love interest, [AD], her former husband, and her then current boyfriend, [RF]. He also used the platforms to acquire information about individuals involved in his investigation to include law enforcement officers and the military prosecutor assigned to the case. [Appellant] sent the information obtained to numerous Vodou practitioners so they could perform rituals to cast love spells against [AD] and obstruction spells against the chain of command, investigators, and the prosecutor assigned to the case. [Appellant] sent one Vodou practitioner, [PS], images of [his] chain of command and the military prosecutor in the case. [PS] used these images to conduct an expedition which consisted of wrapping these images around a rooster, stabbing the images through the face and into the rooster, and then setting fire to the images and rooster.

(Stipulation of Fact, p. 96–97).

The military judge directly advised and asked appellant and counsel about the stipulation:

> [Military Judge]: If I admit the stipulation into evidence, it will be used in two ways. First, I will use it to determine if you are guilty of the offenses to which you have pled guilty. Second, I will use it to determine an appropriate sentence for you. Do you agree? Do you understand and agree to these uses of the stipulation?
>
> [Appellant]: Yes, Your Honor.
>
> [Military Judge]: Do both counsel also agree to these uses?
>
> [Trial Counsel]: Yes, Your Honor.
>
> [Civilian Defense Counsel]: Yes, Your Honor.

(R. at 19).

Soon after, the military judge again asked civilian defense counsel whether he "[had] any objections to [the stipulation.]" Appellant's civilian defense counsel said, "No, Your Honor." (R. at 22).

## LAW AND DISCUSSION

The First Amendment to the Constitution of the United States provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . .."

Rule for Courts-Martial 1001(b)(4) permits presentencing "evidence as to any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty."

We review the application of the Religious Freedom Restoration Act (RFRA) de novo. *United States v. Sterling*, 75 M.J. 407, 415 (C.A.A.F. 2016). We also consider de novo whether the government violated appellant's First Amendment right to freely exercise his religion. *See United States v. Rollins*, 61 M.J. 338, 343 (C.A.A.F. 2005).

Government conduct that does not violate the free exercise clause might nonetheless violate RFRA. *Sterling*, 75 M.J. at 415. *See United States v. Kelly*, 2019 U.S. Dist. LEXIS 177628 (2019) (citing *Holt v. Hobbs*, 574 U.S. 352, 135 S. Ct. 853, 859, 190 L. Ed. 2d 747 (2015); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014). Under the RFRA, an accused must initially demonstrate: "by a preponderance of the evidence that the government action (1) substantially burdens (2) a religious belief (3) that the [accused] sincerely holds." *Sterling*, 75 M.J. at 415. Faced with that prima facie showing, the government must then prove "that its actions were 'the least restrictive means of furthering a compelling governmental interest.'" *Id.* at 416 (quoting *United States v. Quaintance*, 608 F.3d 717, 719–20 (10th Cir. 2010)).

"Whether an appellant has waived an issue is a legal question we review de novo." *United States v. Schmidt*, 82 M.J. 68, 72 (C.A.A.F. 2021) (citing *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020).

"When an appellant does not raise an objection to the admission of evidence at trial, [we] first must determine whether the appellant waived or forfeited the objection." *United States v. Jones*, 78 M.J. 37, 44 (C.A.A.F. 2017) (citing *United States v. Sweeney*, 70 M.J. 296, 303–04 (C.A.A.F. 2011)). Subject to our authority as a service court of criminal appeals to pierce waiver, *United States v. Steele*, __ M.J. __ 2023 CAAF LEXIS 185, at *2–3 (C.A.A.F. 2023), "[i]f the appellant waived the objection, then we may not review it at all." *Jones*, 78 M.J. at 44 (citing *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009). "But if the appellant merely forfeited the objection, then we may review the objection for plain error." *Id.* (citing *Sweeney*, 70 M.J. at 304). We "presum[e] against finding a waiver of constitutional rights." *Id.* (citing *Sweeney*, 70 M.J. at 304). However, "waiver of a constitutional right is effective if it 'clearly established that there was an intentional

relinquishment of a known right.'" *Id.* (citing *Sweeney*, 70 M.J. at 303-304). "In certain and exceptional circumstances, counsel may waive a constitutional right on behalf of a client." *Id.* (citing *United States v. Harcrow*, 66 M.J. 154, 157 (C.A.A.F. 2008)).

Citing both the First Amendment and the RFRA, appellant alleges the government violated[5] his right to freely exercise his religious beliefs. Most of appellant's alleged examples come from the stipulation. For example, appellant writes:

> At trial, the first mention of Vodou discussed the Vodou use of powders in rituals and the belief that certain powders can cause injury or death. (Pros. Ex. 1, para. 7). Prosecution Exhibit 1 explained that appellant asked for "expeditions" against his wife, requesting that spirits attack her. (Pros. Ex. 1, paras. 16–17)[.] The government included photographs of each of the expeditions in the stipulation of fact. (Pros. Ex. 1, paras 24–25, 49, 53). The photo of the first expedition appears to include, *inter alia*, a human skeleton and a child's doll in a fire pit. (Pros. Ex. 1, p. 16).

(Appellant's Br. 4) (footnote omitted)).

As described in the stipulation, appellant's actions to summon Vodou rituals regarding AD ("love spells") and certain government officials ("obstruction spells") were consistent with his First Amendment right to freely exercise his religious beliefs. Like the religious practice in *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993),[6] these rituals included, with respect to government officials, animal sacrifice; however, that does not deprive them of constitutional protection. Beyond the stipulation's use of the word "obstruction" to describe some of the spells, the record contains no indication that they called for any illegal

---

[5] We fundamentally agree with one of appellant's points: "There is no statute, regulation, or published order to reference in this case. But the fact that the government acted *ad hoc* in no way makes the government's actions less of a government action." Appellant's Br. 20 (citing *US v. Webster*, 65 MJ 936, 946-47 (ACCA 2008). *See also Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S.Ct. 1719 (2018).

[6] In that case, the Supreme Court held that city ordinances prohibiting animal sacrifice violated Santeria practitioners' First Amendment right to freely exercise their religious beliefs.

activity or result. Considering this, along with the parties' very thorough agreed–upon description of the case at trial, we conclude they did not view the spells *per se* as criminal activity; rather, the parties viewed these rituals as akin to prayer. The stipulation's derogatory references to these Vodou rituals—after all, they were categorized as "aggravation" evidence—violated the First Amendment's free exercise clause.[7] The government, consistent with the Constitution's guarantee of free exercise, "cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop, Ltd. V. Colo. Civil Rights Comm'n*, 138 S.Ct. 1719, 1731 (2018)

However, our analysis does not end there, for *appellant complains about these references for the first time on appeal*. He waived his objection to evidence of these particular spells in two ways (both covered above in our decision's background section). First, the military judge directly advised appellant and his counsel that, if he admitted it, he would consider the stipulation of fact to decide whether appellant was guilty, and, if so, an appropriate sentence; appellant and his counsel agreed. Second, the military judge specifically asked appellant's counsel whether he had any objections to the stipulation; counsel responded, "No, Your Honor." (R. at 22).

In addition to his complaints about the stipulation, appellant now specifically objects to the government's sentencing case and argument, including witnesses' description of █'s religious faith and trial counsel's description of appellant's "willing[ness] to invoke evil and supernatural forces on his own behalf." (R. at 270). Again, though, he makes these objections for the first time on direct appeal. Beyond waiving or forfeiting these objections by not raising them at trial, except for the "love spells" and "obstruction spells" evidence, appellant has fallen short of showing that the government's sentencing evidence or argument was objectionable in the first place,[8] and he certainly has not shown that either of them was plainly erroneous. Instead, the government's sentencing case offered a detailed view of

---

[7] Finding a First Amendment violation—albeit waived—we need not exhaustively address appellant's RFRA complaint regarding this part of the stipulation. Even if we did—and found a RFRA violation—appellant similarly waived that claim.

[8] Under the circumstances of this case—and particularly considering the matters stipulated by the parties during arms-length pretrial negotiations—we decline to use our authority to pierce waiver. *See Steele*, __ M.J. __ 2023 CAAF LEXIS 185 at *2–3.

appellant's misconduct, and trial counsel's sentencing argument was a fair and reasonable commentary on that evidence – often without defense objection.[9]

Appellant's RFRA complaint on appeal merits very brief discussion, but no relief. Fundamentally, RFRA provides the basis for a *defense*, which must be raised at trial. By his plea of guilty, appellant waived this claim. Even if we decided appellant preserved the issue, the defense would fail, for one must show, by a preponderance of the evidence, "that the government action (1) substantially burdens (2) a religious belief (3) that the defendant sincerely holds." *Sterling*, 75 M.J. at 415. We are unmoved by appellant's claim that the government's actions in prosecuting him and describing his Vodou-based methods "substantially burden[ed]" his sincere belief that he would be able to use Vodou to murder █

Turning to appellant's violence toward █ we view this as substantially different from the rituals about AD and government officials. We have searched for, but cannot find, any authority to support appellant's *tacit* argument that the First Amendment's "free exercise" clause can broadly shield one from government action to describe, prosecute, and punish conduct that unlawfully endangers another person's life. Although not directly on point as a "free exercise" case, the historic Supreme Court case, *Schenck v. United States*, 249 U.S. 47, 52 (1919), held that the First Amendment's free speech clause does not allow one to yell "fire" in a crowded movie theater:

> [T]he question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent.

Surely, as with the free speech clause, the "free exercise" clause cannot excuse the "clear and present danger" appellant pursued toward █ The Sixth Circuit's decision in *United States v. Varani*, 435 F.2d 758, 762 (6th Cir. 1970), is also analogous, concluding that "speech is not protected by the First Amendment when it is the very vehicle of the crime itself." We hold the same limitation applies to the "free exercise" clause.

Put plainly, we decline to characterize appellant's violent misconduct toward █ as the free exercise of religious belief. We recognize "[t]he determination of

---

[9] Appellant objected multiple times to the government's efforts to depict █ through its sentencing witnesses, and the military judge clearly sustained some of them and overruled others. It is equally clear, though, that these objections neither directly nor indirectly referred to the First Amendment's free exercise protection.

what is a 'religious' belief or practice is more often than not a difficult and delicate task . . .." *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 714 (1981). However, that statement offers a corollary: sometimes that "determination" is "not a difficult and delicate task." It is possible and reasonable—as here—to conclude that activities that harm others are not protected by the free exercise clause. To characterize appellant's chosen techniques to plan, express, and actuate his intent to murder ██ as the free exercise of his religious beliefs would expropriate the *free* exercise clause of any principled, reasonable meaning. The United States Constitution's framers and the various ratifying conventions plainly and deliberately did not contemplate that one could seek protection in the clause for an act that violated another's right to be free from malicious violence.[10] [11]

## CONCLUSION

For the reasons mentioned above, the findings of guilty and the sentence are AFFIRMED.

Chief Judge SMAWLEY and Judge MORRIS concur.

FOR THE COURT:

JAMES W. HERRING, JR.
Clerk of Court

---

[10] *See* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (May 1990).

[11] We have carefully considered our superior court's recent decision in *United States v. Kim*, __ M.J. __ 2023 CAAF LEXIS 292* (C.A.A.F. 2023). We are confident it does not compel a different result here, as appellant's violence toward ██ does not "occup[y] a constitutional gray area" of religious freedom. *Id.* at *8.