FILED
United States Court of Appeals
Tenth Circuit

**June 28, 2010**

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

DANUEL DEAN QUAINTANCE and
MARY HELEN QUAINTANCE,

    Defendants-Appellants.

Nos. 09-2013, 09-2014
(D.C. No. 06-CR-538-JCH)
(D.N.M.)

**ORDER**

Before **HENRY**, **EBEL**, and **GORSUCH**, Circuit Judges.

The court has sua sponte determined that the order and judgment entered in this appeal on May 19, 2010, should be published. Accordingly, the prior order and judgment is being filed today as a published decision. The version of the decision for publication follows this order.

Entered for the Court,

ELISABETH A. SHUMAKER, Clerk

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

DANUEL DEAN QUAINTANCE and
MARY HELEN QUAINTANCE,

      Defendants-Appellants.

Nos. 09-2013 and 09-2014

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 06-CR-538-JCH)**

---

Scott M. Davidson, Albuquerque, New Mexico, for Defendant-Appellant Danuel Dean Quaintance.

John F. Robbenhaar, Assistant Federal Public Defender, Albuquerque, New Mexico, for Defendant-Appellant Mary Helen Quaintance.

Terri J. Abernathy, Assistant United States Attorney (Gregory J. Fouratt, United States Attorney, with her on the briefs), Las Cruces, New Mexico, for Plaintiff-Appellee.

---

Before **HENRY**, **EBEL**, and **GORSUCH**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

Danuel and Mary Quaintance responded to their indictment for conspiracy and possession with intent to distribute marijuana with a motion to dismiss. They didn't deny their involvement with the drug, but countered that they are the founding members of the Church of Cognizance, which teaches that marijuana is a deity and sacrament. As a result, they submitted, any prosecution of them is precluded by the Religious Freedom Restoration Act ("RFRA"), which forbids the federal government from substantially burdening sincere religious exercises absent a countervailing compelling governmental interest.

After taking extensive evidence, the district court denied the motion to dismiss. It held, as a matter of law, that the Quaintances' professed beliefs are not religious but secular. In addition and in any event, the district court found, as a matter of fact, that the Quaintances don't sincerely hold the religious beliefs they claim to hold, but instead seek to use the cover of religion to pursue secular drug trafficking activities.

After this ruling, the Quaintances pled guilty to the charges against them but reserved their right to appeal the district court's denial of their motion to dismiss. They do that now. Because we conclude the district court did not err in finding the Quaintances insincere in their beliefs, we affirm its judgment.

I

A

While the Quaintances are the only appellants before us, their case stems from the arrest of Joseph Butts, Ms. Quaintance's brother and a co-defendant in the district court

proceedings. During a traffic stop in eastern Missouri, a drug-sniffing dog alerted to the presence of narcotics in Mr. Butts's pickup truck. In the vehicle, which Mr. Butts said belonged to his sister or his sister-in-law, officers discovered approximately 338 pounds of marijuana. Mr. Butts was promptly arrested.

On learning of Mr. Butts's arrest, the Quaintances sought to raise the $100,000 needed to bail him out of jail. According to Timothy Kripner, another co-defendant in the district court, the Quaintances called to recruit him for "a job." R. Vol. III at 287. Mr. Kripner agreed to rent a car and drive to the Quaintances' home in Arizona, where they told him of Mr. Butts's arrest in Missouri for transporting marijuana. To raise the money needed for bail, they asked Mr. Kripner to make a delivery for them. As they explained the plan, the next day Mr. Kripner would pick up a load of marijuana in New Mexico and drive it to California. There, his car would "be stashed with $100,000," which he was to return to the Quaintances. R. Vol. III at 290. The Quaintances later added two more deliveries to the agenda, another to California and one to Arizona. For his trouble, Mr. Kripner was promised $35,000.

Their plans set, the next day the Quaintances and Mr. Kripner traveled in tandem to Lordsburg, New Mexico, using cellular phones and two-way radios to communicate between the two cars. A few miles outside of town, they rendezvoused with "backpack runners" from Mexico, who loaded four bags filled with marijuana into Mr. Kripner's car. Before they could leave the scene, however, Border Patrol agents stopped both Mr. Kripner's and the Quaintances' cars. The agents searched the vehicles, discovering in

3

Mr. Kripner's car the bags containing approximately 172 pounds of marijuana. The

Quaintances and Mr. Kripner were arrested and later indicted for possession of marijuana

with intent to distribute and conspiracy to commit the same. A superseding indictment

added Mr. Butts and the marijuana found in his truck to the conspiracy charge.

B

In due course, the Quaintances moved to dismiss the indictment under RFRA, 42

U.S.C. § 2000bb *et seq.* They explained that they are members of the Church of

Cognizance, which Mr. Quaintance founded in 1991. The church is organized around the

teaching that marijuana is a deity and sacrament. The Quaintances claimed that they

sincerely hold this belief and that possession (and consumption) of marijuana is essential

to their religious exercise. Accordingly, they argued the prosecution against them unduly

burdened their religious beliefs and thus could not stand under RFRA.

RFRA allows religious adherents to challenge government activities that encroach

on their beliefs. To make out a prima facie RFRA defense, a criminal defendant must

show by a preponderance of the evidence that government action (1) substantially

burdens (2) a religious belief, not merely a philosophy or way of life, (3) that the

defendant sincerely holds. *United States v. Meyers*, 95 F.3d 1475, 1482 (10th Cir. 1996).

If a defendant makes that showing, it falls to the government to show that the challenged

action is justified as the least restrictive means of furthering a compelling governmental

interest. *Id.* Here, the government conceded that criminal punishment for the charged

crimes constitutes a substantial burden, leaving the Quaintances to prove the religiosity

4

and sincerity prongs of their prima facie defense.

The Quaintances sought and received an evidentiary hearing in connection with their motion to dismiss. That hearing eventually consumed approximately three days, during which the district court received live testimony from ten witnesses as well as argument and briefing from counsel. At the end of it all, the district court issued an extensive 38-page opinion denying the motion to dismiss and concluding that the Quaintances had failed to establish either of the remaining elements of their prima facie case.

In the district court's view, the Quaintances failed to show that their beliefs about marijuana qualify as "religious" within the meaning of RFRA.[1] Even if they had succeeded on that score, the court added, they couldn't show that they sincerely held their professed religious beliefs, rather than simply used them as cover for secular drug activities. *United States v. Quaintance*, 471 F. Supp. 2d 1153 (D.N.M. 2006).

The Quaintances sought to take an interlocutory appeal challenging these rulings, but we dismissed the appeal, holding that it must wait until the district court entered a final judgment. *United States v. Quaintance*, 523 F.3d 1144 (10th Cir. 2008). After this and other motions practice in the district court, the Quaintances eventually pled guilty to

---

[1] To assess the religiosity of their beliefs, the court followed the approach our court adopted in *Meyers*, 95 F.3d at 1483-84. *Meyers* examined five factors in evaluating religiosity of a belief system: ultimate ideas, metaphysical beliefs, moral or ethical system, comprehensiveness of beliefs, and accoutrements of religion. *Id.* at 1483. The last factor includes ten subfactors: founder, teacher, or prophet; important writings; gathering places; keepers of knowledge; ceremonies and rituals; structure or organization; holidays; diet or fasting; appearance and clothing; and propagation. *Id.* at 1483-84.

the indictment, reserving the right to appeal the district court's rulings.  Once the district

court entered a final judgment of conviction, they brought this appeal.

II

On appeal, the Quaintances challenge both of the district court's independent

reasons for denying their motion to dismiss the indictment.  They argue that the district

court erred as a matter of law when it held their beliefs are not "religious" in nature.  And

they challenge the correctness of the district court's factual finding that their beliefs are,

in any event, not "sincerely held."[2]  Because we cannot say the district court's latter,

sincerity holding was reversibly wrong, we cannot say it erred in denying the motion to

dismiss and need not address the district court's religiosity holding.

---

[2] Notably, in their briefs before us the Quaintances do not challenge the propriety of the district court's decision to address these questions in a pre-trial motion to dismiss.  They do not, for example, argue that the decision on one or the other of these issues implicates the "trial of the general issue" and is therefore inappropriate for pre-trial resolution under Federal Rule of Criminal Procedure 12(b)(2).  Neither do they contend that these questions are properly answered by a jury, not the district court.  At oral argument and through supplemental filings submitted pursuant to Federal Rule of Appellate Procedure 28(j), Mr. Quaintance sought to raise objections along these lines for the first time, arguing the district court erred in not sending his RFRA defense to a jury.  Recognizing our dependence on the adversarial process to sharpen the issues for our decision and the potential inequities associated with passing on an argument to which the opposing party hasn't had a fair opportunity to respond, we decline to entertain this late-blossoming objection.  *See Hill v. Kemp*, 478 F.3d 1236, 1250-51 (10th Cir. 2007); *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1277-78 (10th Cir. 1994) (White, J., sitting by designation).  Moreover, it's unclear whether Mr. Quaintance even *could* raise such objections to the district court's decision, given that the Quaintances specifically *asked* the district court to take evidence and rule on the religiosity and sincerity questions before trial, as it did.  *See United States v. Shaffer*, 472 F.3d 1219, 1227 (10th Cir. 2007) (discussing invited error doctrine).  None of this, however, should be taken as endorsing the pre-trial resolution of motions that implicate factual questions intertwined with the merits, all in contravention of Federal Rule of Criminal Procedure 12(b)(2).  *See United States v. Reed*, 114 F.3d 1067, 1070 (10th Cir. 1997); *United States v. Fadel*, 844 F.2d 1425, 1430-31 (10th Cir. 1988).

6

## A

Under our precedents, sincerity of religious beliefs "is a factual matter," and so, "as with historical and other underlying factual determinations, we defer to the district court's findings, reversing only if those findings are clearly erroneous." *Meyers*, 95 F.3d at 1482; *see also Thiry v. Carlson*, 78 F.3d 1491, 1495 (10th Cir. 1996); *United States v. Seeger*, 380 U.S. 163, 185 (1965) (sincerity of beliefs is "a question of fact"); *Iron Eyes v. Henry*, 907 F.2d 810, 813 (8th Cir. 1990) (reviewing district court's sincerity finding for clear error); *Smith v. Pryo Mining Co.*, 827 F.2d 1081, 1086 (6th Cir. 1987) (same); *Sourbeer v. Robinson*, 791 F.2d 1094, 1102 (3d Cir. 1986) (same). That is, we may disturb the district court's finding of insincerity "only if the court's finding is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." *Aquila, Inc. v. C.W. Mining*, 545 F.3d 1258, 1263 (10th Cir. 2008) (internal quotation marks omitted). To be clearly erroneous, "a finding must be more than possibly or even probably wrong; the error must be pellucid to any objective observer." *Watson v. United States*, 485 F.3d 1100, 1108 (10th Cir. 2007).[3]

---

[3] The Quaintances argue that sincerity wasn't at issue in *Meyers* and *Thiry* and urge us to consider those cases' statements about the applicable standard of review to be *dicta*. Sincerity, they say, is best viewed as a "constitutional fact" meriting "independent" or *de novo* review. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 505-11 & n.27 (1984). Though RFRA offers statutory, not constitutional, protection of religious freedom, the Quaintances note that we have extended the constitutional fact doctrine to certain findings in RFRA cases and subjected them to plenary appellate review. *See United States v. Friday*, 525 F.3d 938, 949-50 (10th Cir. 2008).

7

As the district court noted, numerous pieces of evidence in this case strongly suggest that the Quaintances' marijuana dealings were motivated by commercial or secular motives rather than sincere religious conviction.

First, the Quaintances' colleague and putative fellow church member, Mr. Kripner, testified that the Quaintances considered themselves in the marijuana "business."  R. Vol. III at 280-81.  According to Mr. Kripner, the Quaintances bought marijuana from him about once every two weeks.  The quantities involved ranged from a half pound to a pound, while the prices ran from $350 to $600, which the Quaintances paid in cash, mostly in $100 and $20 bills.  The Quaintances indicated to Mr. Kripner that they were reselling the marijuana, sometimes telling him "it went really fast," other times saying "they were still sitting on some of it."  R. Vol. III at 283.  At one point they complained to Mr. Kripner that he'd sold them "bad weed," saying they "couldn't get rid of it" and it

---

Even assuming without deciding we were free to revisit the governing standard of review, we question whether *de novo* review would be appropriate or make any difference in this case.  Even when the constitutional fact doctrine applies, credibility determinations remain subject to clear error review, *see Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989), and a sincerity finding is in the end "almost exclusively a credibility assessment," *Kay v. Bemis*, 500 F.3d 1214, 1219 (10th Cir. 2007).  In those few instances where the Supreme Court has mandated *de novo* review of facts involving a litigant's state of mind, the inquiry has usually involved some purely legal question.  *See Bose*, 466 U.S. at 511 (holding appellate court must, when evaluating actual malice in libel case, independently determine "whether the evidence in the record . . . is of the convincing clarity required to strip the utterance of First Amendment protection"); *Miller v. Fenton*, 474 U.S. 104, 116-17 (1985) (holding "assessments of credibility and demeanor" are "not crucial" to deciding voluntariness of confession; relevant inquiry is "whether the techniques for extracting the statements . . . are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means").  Sincerity, meanwhile, lacks the legal flavor that makes those questions more readily susceptible to plenary review on appeal.  Further, for reasons that follow, we consider the district court's sincerity finding persuasive under any standard of review that conceivably might pertain.

"was going to hurt their business." R. Vol. III at 280-81.

Second, that business was apparently integral to the particular marijuana transaction resulting in the Quaintances' arrest. As the district court noted, Mr. Butts's arrest and consequent need for $100,000 bail gave the Quaintances a powerful motive "to undertake a large drug transaction for monetary, as opposed to religious, purposes." *Quaintance*, 471 F. Supp. 2d at 1173. And they made it clear to Mr. Kripner that bail money was precisely the goal of the "job" they recruited him to perform. To that end, they coordinated a fairly intricate process whereby Mr. Kripner, together with the Quaintances, was to meet up with backpack runners in the New Mexico desert, collect his marijuana cargo, and then transport the load to California. There, Mr. Kripner would park his car at a hotel, where the Quaintances had arranged for someone to take the car, remove the marijuana, and replace it with $100,000 for Mr. Kripner to return to the Quaintances. Had the whole plan not been short-circuited at the initial pick-up, two more trips were scheduled to follow, ultimately resulting in a $35,000 payday for Mr. Kripner. So it is that the very transaction at issue here was part of a lucrative scheme to raise money for a secular purpose.

Third, the Quaintances hastily inducted Mr. Kripner into the Church of Cognizance the night before he was to pick up the first load of marijuana for them. The Quaintances had previously suggested Mr. Kripner join their church, promising that it would legalize his marijuana use, but he had declined the offer. On the eve of his scheduled pick-up, though, he joined, signing a church membership pledge and receiving

9

a certificate designating him an authorized church courier. But the Quaintances never had him read the pledge or asked if he shared their beliefs. And Mr. Kripner never considered marijuana a deity or sacrament. Rather, he testified that he joined the Church of Cognizance just so he could "do the load" the Quaintances hired him to transport. R. Vol. III at 287. The timing and circumstances of all this, the district court found, tended to suggest that the Quaintances, too, "were acting for the sake of convenience, *i.e.*, because they believed the church would cloak Mr. Kripner with the protection of the law." *Quaintance*, 471 F. Supp. 2d at 1174. That is, they inducted Mr. Kripner because they thought it might insulate their drug transactions from confiscation, "not because they had a sincere religious belief that marijuana is a sacrament and deity." *Id.*

Fourth, Mr. Kripner testified that he sold the Quaintances cocaine along with their marijuana purchases. He shared cocaine with Ms. Quaintance, then later started selling the Quaintances a quarter-ounce of the drug about once a month.[4] The fact that the Quaintances bought cocaine for recreational purposes, the district court explained, tends to "undermine[]," though not foreclose, their assertion that they used another illegal drug (marijuana) for religious rather than secular purposes. *Quaintance*, 471 F. Supp. 2d at

---

[4] While Mr. Kripner testified that he used cocaine with both of the Quaintances, R. Vol. III at 285, the district court found only that he consumed cocaine with Ms. Quaintance, *Quaintance*, 471 F. Supp. 2d at 1174, apparently relying on testimony from a drug task force agent that Mr. Kripner mentioned only Ms. Quaintance's cocaine use when being debriefed after arrest, *see* R. Vol. III at 365. The district court expressly found that Mr. Kripner was credible in other respects, however, and that both Quaintances *purchased* cocaine. *Quaintance*, 471 F. Supp. 2d at 1173-74.

1174.[5]

These four considerations convincingly support the district court's finding that the Quaintances' professed beliefs were not sincerely held.[6]

B

The Quaintances reply by arguing that Mr. Kripner isn't a credible witness and his testimony shouldn't be the basis for assessing their sincerity. They emphasize that Mr. Kripner dealt drugs, violated his bail conditions by breaking a promise not to use drugs, and faced up to forty years' prison time when he testified for the government.

An initial problem with these arguments is that we generally grant "great deference" to a district court's credibility assessments. *Wessel v. City of Albuquerque*, 463 F.3d 1138, 1145 (10th Cir. 2006). Unlike this court, the district court was able to hear Mr. Kripner testify, observe his demeanor on the witness stand, and consider his testimony in light of the weaknesses the Quaintances identify. Having done so, the district court expressly found his testimony credible. We are not well positioned to find

---

[5] The Quaintances deny using cocaine and also challenge its relevance. At most, they say, it reveals they have personal failings, not that their beliefs about marijuana are insincere. But while the Quaintances' recreational cocaine use may not necessarily *rule out* sincerity, it does lend support to the suggestion that their marijuana use was likewise nonreligious.

[6] The district court cited still other considerations in support of its finding that the Quaintances' beliefs were insincere. For example, it observed that Mr. Quaintance was a longtime marijuana user but began to justify his use in religious terms only after he had been arrested for marijuana possession; the lack of evidence that the Quaintances' professed beliefs required them to distribute large quantities of marijuana to church members; and the lack of religious ceremony at Mr. Kripner's induction into the church. The Quaintances argue that these considerations are legally improper for various reasons. But, because the evidence we've already discussed in the text supplies more than enough record support for a finding of insincerity, we need not grapple with any of these issues.

11

otherwise. And our own review of the record in this case reveals nothing that would lead us, in any event, to reach a contrary conclusion. So, for example, despite Ms. Quaintance's contention that Mr. Kripner's account of events "is practically nonsense," Mary Opening Br. at 57, Mr. Kripner's testimony appears to us coherent and does not contain the sort of glaring internal inconsistencies or wild details that might render it incredible.

Relatedly but distinctly, the Quaintances complain that the district court *selectively* credited Mr. Kripner's testimony by ignoring certain other statements of his suggesting the Quaintances' beliefs were both religious and sincere. But this argument overstates the import of what Mr. Kripner actually said. After Mr. Kripner testified that Mr. Quaintance had told him marijuana was the "tree of life," defense counsel asked Mr. Kripner if Mr. Quaintance believed what he'd said. R. Vol. III at 297-98. Mr. Kripner replied, without further elaboration, "To a certain extent." R. Vol. III at 298. This testimony, however, does little to assist the Quaintances' cause. The district court noted that the Quaintances themselves had introduced "no evidence" that this particular "tree of life" concept reflected their asserted *religious* beliefs — as opposed to a belief in marijuana as a source of food, clothing, fuel, and shelter. *Quaintance*, 471 F. Supp. 2d at 1174 n.23. Moreover, even assuming without deciding that the "tree of life" concept might have religious significance, Mr. Kripner's testimony does no more than equivocate on the sincerity of the Quaintances' belief in it.

Finally, the Quaintances urge us to credit their own claims and evidence of

12

sincerity. They point to, among other things, their history of publicly professing their beliefs about marijuana and their modest standard of living, as well as the Church of Cognizance's official condemnation of selling marijuana. They say these facts tend to suggest sincere religious adherence. Even assuming without deciding that this is so, the record contains additional, overwhelming contrary evidence that the Quaintances were running a commercial marijuana business with a religious front — particularly in this transaction, aimed at securing bail money for Ms. Quaintance's brother. In light of this competing evidence, we can hardly say that the Quaintances' evidence of sincerity renders the district court's finding of insincerity erroneous, let alone clearly erroneous.

\* \* \*

Because the district court's finding of insincerity stands, it is unnecessary for us to address the district court's alternative holding that the Quaintances' proffered beliefs were not even religious in nature. Without the essential element of sincerity, their RFRA defense must fail. The judgment of the district court is affirmed.

13