FILED
United States Court of Appeals
Tenth Circuit

January 7, 2019

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

REVEREND MATTHEW HALE,

    Plaintiff - Appellant,

v.

FEDERAL BUREAU OF PRISONS;
DAVID B. BERKEBILE; BLAKE
DAVIS; CHRISTOPHER SYNSVOLL;
BENJAMIN BRIESCHKE; S. M. KUTA;
L. MILUSNIC; PATRICIA RANGEL;
WENDY HEIM; S. SMITH; DIANA
KRIST; A. TUTTOILMONDO, and H.
REDDEN, individually,

    Defendants - Appellees.

No. 18-1141
(D.C. No. 1:14-CV-00245-MSK-MJW)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **McHUGH**, **MORITZ**, and **EID**, Circuit Judges.
_____

Reverend Matthew Hale, a pro se federal prisoner, sued the Federal Bureau of

Prisons and some of its officers and employees (collectively, BOP) for, broadly speaking,

religious discrimination. The district court granted the defendants' motions to dismiss

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

and for summary judgment, prompting this appeal. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

Mr. Hale is "a minister in The Church of the Creator," which "embraces and espouses the religion of Creativity." R., Vol. I at 28. "The overriding mission of the Church and the Creativity religion is the permanent prevention of the cultural, genetic, and biological genocide of the White Race worldwide and thus the achievement of White racial immortality." *Id.* at 28-29. "Creativity thus espouses the collective salvation of the White Race through its immortality on earth rather than individual, personal salvation in a supposed 'afterlife.'" *Id.* at 29. One of the central tenets of Creativity is that "Good is personified by the White Race and the crusade for its future[,] while evil is personified by its antithesis in this world, the Jewish Race." *Id.* at 43.

Mr. Hale's incarceration at the Administrative Maximum penitentiary (ADX) in Florence, Colorado has a connection to his church. Specifically, he is serving a forty-year sentence for obstructing justice and soliciting the murder of a federal judge who entered a judgment against the church's predecessor. In affirming Mr. Hale's convictions, the Seventh Circuit Court of Appeals described Mr. Hale's church as a "white supremacist organization," for which he was the leader. *United States v. Hale*, 448 F.3d 971, 975 (7th Cir. 2006).

The BOP has designated Creativity a security threat group (STG), because inmates following its tenets have engaged in acts of violence, including murdering other inmates and instigating race riots. Accordingly, the BOP has placed restrictions on Mr. Hale

2

impacting his participation in Creativity. In particular, the BOP imposed mail restrictions for roughly six months in 2010 when he sought to reestablish himself as Creativity's leader, eight months in 2013 when he encouraged a neo-Nazi leader to pursue mass activism tactics, and for an ongoing period beginning in 2014 when he targeted a federal magistrate judge.[1] The BOP also denied Mr. Hale's requests for a special diet and for access to a book that Creativity adherents regard as their bible, "Nature's Eternal Religion."[2] Finally, the BOP prevented Mr. Hale from being interviewed in person by a television reporter.

In 2014, Mr. Hale filed the instant lawsuit, alleging that the defendants violated numerous constitutional and statutory rights "by . . . taking away and interfering with his mail rights, forbidding his participation in his church, and denying . . . his religious diet." R., Vol. I at 26. Mr. Hale sought monetary and injunctive relief against the defendants in the context of multiple claims for relief: (1) the mail restrictions violated First

---

[1] From May 2016 to April 2017, Mr. Hale was incarcerated in the federal penitentiary in Terre Haute, Indiana. He was returned to ADX after sending out a press release that referred to the magistrate judge "us[ing] racially charged terms . . . plainly designed to incite [Mr. Hale's] followers and supporters in the Creativity Movement and other white supremacist groups." R., Vol. V at 662-63. Thus, Mr. Hale is currently prevented from sending or receiving correspondence that "contains any reference to Creativity, the Creativity Movement, the Worldwide Church of the Creator, the Creativity Alliance, or any permutation of or code for these group names." *Id.* at 778 (emphasis omitted).

[2] "Nature's Eternal Religion" teaches: "Throughout Nature the laws are quite clear: in order to survive when a menace or danger threatens, that menace is attacked and destroyed. We must therefore make it our prime goal to expunge the Jews and the niggers from America, in fact from all other White areas." R., Vol. III at 344.

Amendment guarantees of free speech, free religious exercise, and free association; (2) the mail restrictions were imposed to retaliate against Mr. Hale for invoking his speech and religious rights; (3) the mail restrictions violated the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb-1 to -4; (4) the mail restrictions violated procedural due process; (5) the restriction on "Nature's Eternal Religion" violated the "First Amendment," R., Vol. I at 45; (6) the differential treatment of inmates from different faiths violated equal protection; (7) the restriction on "Nature's Eternal Religion" violated RFRA; (8) the denial of a religious diet violated the "First Amendment," *id.* at 49; (9) the denial of a religious diet violated RFRA; and (10) the denial of a news interview violated the "First Amendment," *id.* at 50.[3]

On the defendants' motion, the district court dismissed Mr. Hale's due-process, equal-protection, and First Amendment (news interview) claims. The court explained that Mr. Hale's due-process claim failed to allege a protected liberty interest in mail rights, and that the equal-protection claim failed to allege differential treatment of similarly-situated prisoners. The news-interview claim failed, the court said, because there was no allegation of a possible interview.[4]

---

[3] Mr. Hale also complained of the BOP's use of solitary confinement. He has abandoned that claim on appeal.

[4] The district court also dismissed Mr. Hale's damages claims premised on First Amendment theories, explaining that there were inadequate allegations of personal participation or discriminatory motivation by any defendant. The district court also noted the Supreme Court's reluctance to recognize damages claims against federal officers (i.e., *Bivens* claims) beyond three circumstances—improper searches, gender discrimination, and cruel and unusual punishment. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854-55 (2017). Indeed, the Supreme "Court has made clear that expanding the *Bivens* remedy is

4

The defendants prevailed on the remaining claims at summary judgment. Specifically, the district court granted summary judgment in the defendants' favor regarding (1) whether the mail restrictions violated either the Free Exercise Clause or RFRA, or were imposed in retaliation for asserting a constitutional right; (2) whether the denial of a Creativity diet violated either the Free Exercise Clause or RFRA; and (3) whether the denial of a copy of "Nature's Eternal Religion" violated Mr. Hale's free-speech rights. Most of the claims were resolved by the district court determining that Creativity did not qualify as a religion, and even if it did, the BOP had compelling and narrowly tailored interests in restricting Mr. Hale's rights. As for the denial of

now a disfavored judicial activity." *Id.* at 1857 (internal quotation marks omitted). For purposes of this appeal, our substantive determinations below in the context of injunctive relief make it unnecessary to weigh in on the adequacy of Mr. Hale's allegations.

Additionally, the district court dismissed Mr. Hale's RFRA damages claims against the BOP (because there was no waiver of sovereign immunity) and against the individual defendants because, again, there were inadequate allegations of personal participation or discriminatory motivation. The court was correct that RFRA does not waive the federal government's sovereign immunity from damages. *See Davila v. Gladden*, 777 F.3d 1198, 1210 (11th Cir. 2015); *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 840-41 (9th Cir. 2012); *Webman v. Fed. Bureau of Prisons*, 441 F.3d 1022, 1026 (D.C. Cir. 2006). Because we determine below that Mr. Hale's injunction-based RFRA claims fail on their merits, we need not consider the adequacy of Mr. Hale's allegations or whether RFRA damages claims are available against individual defendants, *see Tanvir v. Tanzin*, 894 F.3d 449, 466 (2d Cir. 2018) (holding that "RFRA authorizes individual capacity suits against federal officers for money damages"); *Davila*, 777 F.3d at 1210 ("declin[ing] to address whether RFRA authorizes suits against officers in their individual capacities"); *Mack v. Warden Loretto FCI*, 839 F.3d 286, 304 (3d Cir. 2016) ("conclud[ing] that federal officers who violate RFRA may be sued in their individual capacity for damages"); *Kikumura v. Hurley*, 242 F.3d 950, 954 (10th Cir. 2001) (involving RFRA, as well as other claims seeking monetary and injunctive relief, but not discussing the availability of RFRA damages).

"Nature's Eternal Religion," the district court noted that the BOP had changed course and allowed its possession, but in any event, the BOP had the discretion to bar it.

## DISCUSSION
### I. Standards of Review

"We review de novo the grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Gee v. Pacheco*, 627 F.3d 1178, 1183 (10th Cir. 2010). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Under this standard, all well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party[.]" *Acosta v. Jani-King of Okla., Inc.*, 905 F.3d 1156, 1158 (10th Cir. 2018) (internal quotation marks omitted).

Our review of an order granting summary judgment is likewise de novo. *See J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1294 (10th Cir. 2016). Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and must resolve all factual disputes and draw all reasonable inferences in his favor. *See Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013).

Finally, "we generally construe pro se pleadings liberally." *Comm. on Conduct of Attorneys v. Oliver*, 510 F.3d 1219, 1223 (10th Cir. 2007) (internal quotation marks

6

omitted).  We do not, however, extend that courtesy to a pro se litigant who is a licensed attorney.  *Id.*  Mr. Hale, a law school graduate, falls somewhere in between a typical pro se litigant and a licensed attorney.  Nevertheless, under the circumstances of this case, we choose to apply our ordinary liberal pleading construction.  *See Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010) (stating that "the degree of solicitude *may* be lessened where the particular *pro se* litigant is experienced in litigation and familiar with the procedural setting presented" (emphasis added)).  "[B]ut we will not act as [Mr. Hale's] advocate." *James v. Wadas*, 724 F.3d 1312, 1315 (10th Cir. 2013).

## II.  Mail Restrictions

Under the mail restrictions, Mr. Hale may correspond with anyone outside the prison, even other Creativity adherents, but he may not communicate *about* Creativity.[5] Further, no ADX inmate may send or receive communications about STGs, including Creativity.

Mr. Hale claims the mail restrictions violate his rights under RFRA, the Free Exercise Clause, and the Free Speech/Association Clauses.  He also asserts that the restrictions constitute unlawful retaliation.

---

[5] The district court considered the past and present mail restrictions in the aggregate, viewing them essentially as an ongoing restriction on Mr. Hale's ability to send and receive communications about Creativity.  We follow this approach.  *See Al-Owhali v. Holder*, 687 F.3d 1236, 1242 (10th Cir. 2012) (concluding that expired restrictions on inmate's receipt of Arabic-language newspapers were not moot because the restrictions were "capable of repetition yet evad[ing] review" (internal quotation marks omitted)).

## A. RFRA

We begin with Mr. Hale's RFRA centered claims, as those are dispositive of much of this case. RFRA bars the federal government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability," unless the government shows that the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b). "[A] plaintiff establishes a prima facie claim under RFRA by proving the following three elements: (1) a substantial burden imposed by the federal government on a (2) sincere (3) exercise of religion." *Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001). A RFRA plaintiff must show by a preponderance of the evidence that his sincerely held beliefs are religious in nature, "rather than a philosophy or way of life." *United States v. Meyers*, 95 F.3d 1475, 1482 (10th Cir. 1996).

To evaluate the religiosity of a belief system, this court follows the approach laid out in *Meyers*. *See United States v. Quaintance*, 608 F.3d 717, 720 n.1 (10th Cir. 2010). "*Meyers* examined five factors in evaluating religiosity of a belief system: ultimate ideas, metaphysical beliefs, moral or ethical system, comprehensiveness of beliefs, and accoutrements of religion." *Id.* We address each *Meyers* factor in turn.

### 1. Ultimate Ideas

"Religious beliefs often address fundamental questions about life, purpose, and death." *Meyers*, 95 F.3d at 1483 (internal quotation marks omitted). They cover such

8

"deep and imponderable" topics as a person's "sense of being[,] . . . purpose in life[,] and . . . place in the universe." *Id.* (internal quotation marks omitted).

Mr. Hale argues that Creativity addresses ultimate ideas, in that it "is the fulfillment of the Eternal Laws of <u>Nature</u>." Aplt. Opening Br. at 40. He stresses that "<u>Nature</u>, not race, . . . provides the basis for all of Creativity's beliefs," *id.* at 31, and that "Nature prescribes a racial, or even racist, view of the world," *id.* at 36. But it is not the alleged source of ideas we are concerned with. Rather, our focus is on the degree to which those ideas seek to explain the very basis of human existence.

As the district court noted, Creativity merely "advocates a hierarchical social structure for human beings during their lifetimes." R., Vol. VII at 451. Indeed, the Creativity bible describes the "Golden Rule" of Creativity as "what is good for the White Race is the highest virtue; what is bad for the White Race is the ultimate sin." *Id.*, Vol. III at 344. And Creativity adherents are directed to "[h]old fast to this great principle as you journey through life, and it will sustain you to the end of your days." *Id.*

Instead of addressing existential, teleological, or cosmological matters, Creativity presents only a singular concern of racial dominance, framed in terms of social, political, and ideological struggles. Thus, Creativity does not address ultimate ideas.

### 2. Metaphysical Beliefs

Mr. Hale concedes that "Creativity is <u>not</u> 'metaphysical.'" Aplt. Opening Br. at 46.

### 3. Moral or Ethical System

Religious beliefs often establish morals or ethics, framing "certain acts in normative terms, such as 'right and wrong,' 'good and evil,' or 'just and unjust.'" *Meyers*, 95 F.3d at 1483. "A moral or ethical belief structure also may create duties—duties often imposed by some higher power, force, or spirit—that require the believer to abnegate elemental self-interest" and avoid "those acts that are 'wrong,' 'evil,' or 'unjust.'" *Id.*

Mr. Hale maintains that a moral or ethical structure underlies Creativity because its adherents must do "what is best for the White <u>Race</u>," rather than "what is best for their individual selves." Aplt. Opening Br. at 49. But that is a false dichotomy. Creativity requires the former; it does not proscribe the latter. In particular, Creativity's First Commandment instructs adherents to "make deadly certain that [the survival of the White Race] cannot ever be imperiled again." R., Vol. III at 341. Anything else, according to Creativity, is "suicidal." *Id.* This unidimensional focus on racial hegemony, designed to benefit the individual adherents of Creativity, as well as the overall group of adherents, is inconsistent with a binary system of morals and ethics.

### 4. Comprehensiveness of Beliefs

Religions present "an overreaching array of beliefs that coalesce to provide the believer with answers to many, if not most, of the problems and concerns that confront humans." *Meyers*, 95 F.3d at 1483. "[S]ingle-faceted ideologies," on the other hand, do "not qualify as religions." *Africa v. Pennsylvania*, 662 F.2d 1025, 1035 (3d Cir. 1981);

*see also Meyers*, 95 F.3d at 1483 (observing that "religious beliefs generally are not confined to one question or a single teaching").

Mr. Hale circularly describes Creativity as comprehensive because it allegedly follows "the [racist] values of the natural world," which, he claims, "are <u>themselves</u> 'comprehensive.'" Aplt. Opening Br. at 54. Additionally, he cites a variety of matters opposed by Creativity: "the mixing of the races, the consumption of cooked food, the ingestion of medicines and the injection of vaccines, artificial chemicals of all kinds, homosexuality, charity, and on and on." *Id.* at 53. But these matters are simply "isolated, unconnected ideas," not representative of any "ultimate and comprehensive truth." *Africa*, 662 F.2d at 1035 (internal quotation marks omitted).

As the district court aptly noted, "Creativity does not answer any of the[ ] foundational questions [about the human condition] unless they can be answered by *all things in furtherance of the white race*." R., Vol. VII at 457; *see, e.g.*, *id.*, Vol. III at 340 (Creativity's Fourth Commandment—"The guiding principle of all your actions shall be: What is best for the White Race?"). Creativity thus lacks a comprehensive belief system.

### 5. Accoutrements of Religion

"By analogy to many of the established or recognized religions, the presence of [various] external signs may indicate that a particular set of beliefs is 'religious[.]'" *Meyers*, 95 F.3d at 1483. In particular, religions often have a "founder, teacher, or prophet; important writings; gathering places; keepers of knowledge; ceremonies and rituals; structure or organization; holidays; diet or fasting; appearance and clothing; and propagation." *Quaintance*, 608 F.3d at 720 n.1.

11

The district court found that Creativity bears the accoutrements of religion: "a founder considered to be a prophet; three important writings; gathering places in its churches around the world; ordained keepers of knowledge; ceremonies and rituals such as weddings, child pledgings, and confirmations of loyalty; a leadership structure with its greatest priest at the top[;] holidays such as Klassen Day, Founding Day, and Martyrs' Day; a diet and fasting . . . ; and a drive to convert people." R., Vol. VII at 459-60. Mr. Hale emphasizes the district court's conclusion, while the defendants argue that "these accoutrements merely support a narrow, secular, political program of racial socialism," Aplee. Br. at 56. Granted, there is evidence in the record supporting the defendants' view. *See, e.g.*, R., Vol. V at 537, 571-72 (Creativity's "Little White Book," urging adherents to become ministers in order to gain "prestige and recognition," "legal protection," and "exemption from . . . Jewish tax collectors"). We cannot conclude, based on the record before us, however, that Creativity lacks the accoutrements of a religion.

### 6. Conclusion

Four of the *Meyers* factors—ultimate ideas, metaphysical beliefs, moral/ethical system, and comprehensive beliefs—indicate that Creativity is not a religion, whereas only one of the factors—accoutrements of religion—suggests otherwise. We therefore conclude that there is no genuine issue of material fact as to whether Creativity qualifies as a religion subject to RFRA protection.

And without "beliefs [that] are religious in nature," *Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007) (internal quotation marks omitted), Mr. Hale's Free Exercise claim

12

likewise fails.  *See Wisconsin v. Yoder*, 406 U.S. 205, 216 (1972) (stating that philosophical and personal beliefs do "not rise to the demands of the [First Amendment's] Religion Clauses").

Thus, the district court properly entered summary judgment against Mr. Hale on his RFRA and Free Exercise mail-restriction claims.

## B.  Freedom of Speech/Association

Mr. Hale contends that the restrictions on Creativity-based communications violate his free speech and association rights.[6]  Restrictions on STG communications are imposed for security reasons existing inside and outside the prison.  The need for these restrictions is comprehensively explained in the affidavit of Special Investigative Services (SIS) Lieutenant Kelly:

> . . . When a group has been found sufficiently dangerous to be accorded STG status, any communications about the group, and any attempt by an inmate to elevate himself to a position of authority in that group, can be dangerous.  From a correctional management perspective, a bright-line rule about STG-related communications is necessary because intelligence personnel cannot be certain which STG-related communications may be benign and which may implicate dangers.
> . . . Intelligence about the activities of a specific group is always fluid.  An STG may have a wide presence, with a complex web of members and associates in the federal and state prison systems and on the streets.

---

[6] Mr. Hale argues that the district court did not address his free speech and association claims.  But the district court necessarily rejected these claims when assuming that even if Creativity qualifies as a religion, the BOP's mail restrictions "were justified by a compelling governmental interest and were narrowly tailored to meet that interest," R., Vol. VII at 460.  Additionally, the district court considered whether the mail restrictions were imposed in retaliation for Mr. Hale's exercise of "First Amendment rights," and it determined that any retaliation was "reasonably related to legitimate penological interests under *Turner[v. Safley*, 482 U.S. 78 (1987)]."  *Id.* at 467.

Keeping track of those many components of the group is not an exact science. It is extremely difficult to track and have complete awareness of the activities of numerous persons in widely varying locations. Intelligence about the group's activities can change on a day-to-day basis, and Bureau intelligence personnel do not have access to that information in real time. Inevitably, intelligence is delayed. Dangers may not be fully apparent until a dangerous plan or risk comes to fruition, such as an executed hit on a targeted individual or a deadly fight on a prison yard between two rival STGs. It is not always possible for staff who monitor inmate communications to be aware of the most current activities of the group, nor can the Bureau be certain that it has a full understanding of the implications of communications among a complex web of associates or how those associates will react to communications from an inmate.

. . . To reduce these dangers, the Bureau must be as proactive as possible. That is why communications about STGs are not allowed. That rule applies to all STGs, not just the Creativity Movement.

. . . The need for a complete bar on STG-related communications is apparent in [Mr. Hale's] case. [Mr. Hale's] danger lies primarily in his communications. His criminal conviction was based on his communications, not his personal involvement in violent conduct. Other people have been inspired to engage in violence (Ben Smith)[7] and have threatened violence against others (William White)[8] because of [Mr. Hale] and the force of his personality and his communications to advance the interests of the Creativity Movement. [Mr. Hale's] communications demonstrate that he wants to keep his memory alive among his followers, who continue to seek to communicate with him about the Creativity Movement. It is extremely dangerous if he is allowed to continue to write about the group and to provide guidance and direction. SIS Department personnel cannot be certain of the precise meaning and implications of his words, or how his communications will be interpreted or used by others. SIS staff may understand the communication in one way, but [Mr. Hale's] followers may have another interpretation.

---

[7] Smith was one of Hale's followers. In 1999, "[d]ays after Hale had publicly announced he was denied an Illinois law license, Smith traveled throughout Illinois and Indiana [shooting] black, Asian, and Jewish victims before committing suicide." *Hale*, 448 F.3d at 975. "Hale gave a eulogy at Smith's memorial service," describing Smith as "a very good man . . . willing[ ] to take action for his people." *Id.* (internal quotation marks omitted).

[8] White was convicted of soliciting the murder of the jury foreperson at Hale's criminal trial.

. . . There are similar risks related to incoming STG-related communications. [Mr. Hale] was returned to the ADX because he could not be safely housed on an open compound because of risks associated with his communications. If [Mr. Hale] receives communications about the Creativity Movement and gains knowledge about the group's activities outside the prison, he may make decisions based on that information or attempt to disseminate those communications to others, both within the prison and by means of telephone calls.

R., Vol. V at 780-81.

A prisoner's right to incoming and outgoing mail is protected by the First Amendment. *Gee*, 627 F.3d at 1188. But "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Four factors guide the *Turner* analysis:

> (1) whether a rational connection exists between the prison policy regulation and a legitimate governmental interest advanced as its justification; (2) whether alternative means of exercising the right are available notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights.

*Al-Owhali v. Holder*, 687 F.3d 1236, 1240 (10th Cir. 2012) (internal quotation marks omitted).

## 1. Rational Connection

"[P]rison security is a compelling state interest, and . . . deference is due to institutional officials' expertise in this area." *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005). Hale does not dispute the facts underlying the BOP's decision to restrict his mail

15

privileges; rather, he disputes the BOP's ultimate determination that restrictions are necessary.

We conclude that the mail restrictions on Mr. Hale are rationally connected to the BOP's security interests. There is overwhelming evidence in the record that Creativity poses an institutional security risk and that Mr. Hale has sought to advance the white-supremacist goals of Creativity in ways that pose a danger both inside and outside of ADX. By limiting Mr. Hale's ability to send and receive mail communicating Creativity's message, the BOP mitigates internal and external safety risks.

### 2. Alternative Means

Because the BOP prohibits all communications concerning STGs, Mr. Hale appears to have no alternative way to exercise his free speech/association rights to the extent he seeks to communicate about Creativity. He is not, however, prohibited from communicating with others, so long as Creativity is not the topic.

### 3. Impact of Accommodations

Mr. Hale identifies no evidence in the record suggesting that the BOP could safely accommodate his rights to send and receive mail concerning Creativity. Indeed, the undisputed record evidence indicates the difficulty involved in screening correspondence regarding Creativity as it relates to internal and external security risks.

### 4. Easily Implemented Accommodations

There is no evidence in the record of any easy-to-implement alternatives to a mail ban that would accommodate Mr. Hale's free speech/association rights. As already indicated, a security/safety risk is inherent in Creativity communications.

16

## 5. Conclusion

Upon considering the *Turner* factors, we conclude that summary judgment was appropriate on Mr. Hale's free speech/association claims targeting the BOP's mail restrictions. Those restrictions are reasonably related to legitimate penological interests. *See Bell v. Wolfish*, 441 U.S. 520, 546 (1979) ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of . . . prisoners.").

## C. Retaliation

Prison officials may not retaliate against an inmate because of the inmate's exercise of First Amendment rights. *Requena v. Roberts*, 893 F.3d 1195, 1211 (10th Cir. 2018), *petition for cert. filed* (U.S. Sept. 18, 2018) (No. 18-6264). Mr. Hale alleged that the BOP restricted his mail to punish his "participat[ion] in his Church and religious faith as well as his exercise of his freedom of speech." R., Vol. I at 43.

We have already determined that no triable issue of fact exists as to whether the mail restrictions violated Mr. Hale's religious or free speech/association rights. Therefore, his retaliation claim likewise fails. *See Frazier v. Dubois*, 922 F.2d 560, 562 (10th Cir. 1990) (holding that the *Turner* analysis applies to prisoner retaliation claims); *Smith v. Maschner*, 899 F.2d 940, 948 (10th Cir. 1990) (stating that "retaliation for the exercise of a *constitutionally protected right* is actionable" (emphasis added; internal quotation marks omitted)); *cf. Requena*, 893 F.3d at 1211 (observing that "claims of retaliation fail if the alleged retaliatory conduct violations were issued for the actual

violation of a prison rule," and that "a defendant may successfully defend a retaliatory discipline claim by showing some evidence the inmate actually committed a rule violation" (internal quotation marks omitted)).

### D. Due Process

Mr. Hale alleged in his complaint that the BOP restricted his mail rights without giving him prior notice and an opportunity to be heard. "A person alleging that he has been deprived of his right to procedural due process must prove two elements: that he possessed a constitutionally protected liberty or property interest such that the due process protections were applicable, and that he was not afforded an appropriate level of process." *Zwygart v. Bd. of Cty. Comm'rs*, 483 F.3d 1086, 1093 (10th Cir. 2007) (internal quotation marks omitted). Mr. Hale clarifies on appeal that his due-process claim involves a purported liberty interest.

We have already determined that the BOP's restriction on Mr. Hale's correspondence was reasonably related to legitimate penological interests. As the Supreme Court has stated, "the[ ] due process rights of prisoners . . . are not absolute; they are subject to reasonable limitation or retraction in light of the legitimate security concerns of the institution." *Bell*, 441 U.S. at 554. Indeed, a prisoner's due process rights will not generally be implicated by disciplinary actions that do not "impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Mr. Hale's complaint is devoid of any such allegations.

18

In short, mail restrictions like the ones imposed here do not present procedural due-process concerns. *See Gowadia v. Stearns*, 596 F. App'x 667, 672 (10th Cir. 2014) (finding no liberty interest implicated by restrictions on inmate's telephone and mail privileges);[9] *Kennedy v. Blankenship*, 100 F.3d 640, 642-43 (8th Cir. 1996) (finding no liberty interest implicated by thirty-day sanction that included restrictions on mail and telephone privileges, visitation privileges, commissary privileges, and personal possessions).

We conclude that the district court properly dismissed Mr. Hale's due-process claim.

### E. Equal Protection

Mr. Hale alleged in his complaint that if he had "been a Christian, Muslim, or Jew instead of a Creator, the defendants would not have imposed the mail bans or denied him his scripture." R., Vol. I at 47.[10] He further alleged that differential treatment is shown

---

[9] "Unpublished decisions are not precedential, but may be cited for their persuasive value." 10th Cir. R. 32.1; *see also* Fed. R. App. P. 32.1.

[10] Although the BOP has allowed Mr. Hale to possess "Nature's Eternal Religion" since April 2014, we assume that the deprivation is capable of repetition and evading review given the BOP's admission that it seized the text recently for "seven days while a specific security concern was investigated," Aplee. Br. at 94. Thus, the restriction on Creativity's bible presents a justiciable equal-protection issue. To the extent Mr. Hale also alleged that denying him a copy of Creativity's bible violated his religious rights, we have already determined that Creativity does not qualify as a religion entitled to RFRA and First Amendment protections. Moreover, our conclusion, that a rational connection exists between the BOP's restriction of Mr. Hale's Creativity-related mail and legitimate penological interests, applies equally to a restriction on Mr. Hale's possession of "Nature's Eternal Religion." *See Jones v. Salt Lake Cty.*, 503 F.3d 1147, 1158 (10th Cir. 2007)

by the fact that ADX allows "black religious programming[] on its religious television channel" and "distributes the Christian Bible and the Muslim Koran to prisoners upon request." *Id.* at 46, 48. He claimed that the defendants' actions were motivated by their "disdain [for] his particular religion and church." *Id.* at 48.

"With any equal protection claim, the plaintiff must . . . demonstrate that he was treated differently than another who is similarly situated." *Brown v. Montoya*, 662 F.3d 1152, 1173 (10th Cir. 2011) (brackets and internal quotation marks omitted). Mr. Hale's allegations do not satisfy this standard. He identifies no Christian, Jewish, or Muslim comparator who is permitted to send or receive communications about STGs, or who may possess an STG text.

Moreover, as indicated earlier, Creativity does not qualify as a religion (and Mr. Hale does not allege membership in a suspect class). Thus, any differential treatment of similarly-situated comparators would need only a rational basis to pass constitutional muster. *See Carney v. Oklahoma Dept. of Pub. Safety*, 875 F.3d 1347, 1353 (10th Cir. 2017). There is an objectively reasonable basis for restricting Mr. Hale's mail and scripture: preventing violence both inside and outside of ADX.

The district court properly dismissed this claim.

### III. Religious Diet

Mr. Hale alleged that the BOP's refusal to provide him a Creativity-based diet "of raw fruits, vegetables, nuts or seeds" violates RFRA and the First Amendment. R., Vol. I

---

("conclud[ing] [that] . . . Jail's paperback book policy . . . [wa]s rationally related to the legitimate governmental objective of prison security").

at 49.  As we have determined that Creativity does not qualify as a religion, these claims cannot survive summary judgment.

## IV.  TV Interview

Mr. Hale alleged that he was denied the opportunity in 2013 to interview in person with a Chicago-based reporter.  Mr. Hale desired the interview "to bring public awareness to the fact of his innocence and wrongful convictions." *Id.* at 50.  The BOP denied Mr. Hale's request for the interview, citing institutional safety and security concerns.  Mr. Hale claims "[t]he denial of the interview is part of the same pattern of religious and ideological oppression that [he] has stated" throughout his complaint. *Id.* at 51.

Although the district court dismissed this claim as moot, the defendants identify an alternative ground for dismissal—that Mr. Hale's allegations do not "show the absence of a legitimate penological interest in restricting his ability to communicate to his followers and the public at large through the mass media." Aplee. Br. at 102.  This alternative approach is sound.

First, we note that insofar as this claim re-asserts religious discrimination or retaliation claims that we have already rejected, it fails.  Second, we have little difficulty concluding that denying Mr. Hale the opportunity to publicly protest his innocence, in the media market where his crimes occurred, promotes safety and security interests inside and outside ADX.  Indeed, it is well-established that a prison's "no-interview policy is reasonably related to legitimate security interests." *Hammer v. Ashcroft*, 570 F.3d 798,

21

801 (7th Cir. 2009) (emphasis and internal quotation marks omitted); *see, e.g.*, *Saxbe v. Washington Post Co.*, 417 U.S. 843 (1974).

While Mr. Hale alleges that the denial of his interview was not justified by any of the reasons stated in 28 C.F.R. § 540.63,[11] that regulation confers discretion on the institution's warden to deny interviews based on security concerns. Moreover, "a failure to adhere to administrative regulations does not equate to a constitutional violation." *Hovater v. Robinson*, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993).

## CONCLUSION

We affirm the district court's judgment. We direct the Clerk of the Court to return unfiled the "amicus commentaries" submitted in this case, as they fail to meet the requirements of Fed. R. App. P. 29.

Entered for the Court
Per Curiam

---

[11] Subsection (g) of the regulation provides that a request for an in-person media "interview may be denied for any of the following reasons," including that "[t]he interview, *in the opinion of the Warden*, . . . would probably cause serious unrest or disturb the good order of the institution." 28 C.F.R. § 540.63(g)(4) (emphasis added).

22